## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**KEARY BURGER and**
**PHYLLIS BURGER**                                                      **PLAINTIFFS**

**VS.**                                        **Civil Action No. 1:09-cv-00264-LG-RHW**

**USAA CASUALTY INSURANCE COMPANY;**
**and JOHN DOES 1-10,**                                                 **DEFENDANTS**

## FIRST AMENDED CLASS ACTION COMPLAINT
### JURY TRIAL REQUESTED

COME NOW, Keary Burger and Phyllis Burger ("Plaintiffs"), by and through counsel,
and file their First Amended Class Action Complaint, for individual relief, and for relief of a
class of persons similarly situated to themselves, against Defendants USAA Casualty Insurance
Company ("USAA CIC") and John Does 1-10 ("John Does"), and allege as follows:

### I.
### PARTIES

1.      At all relevant times, the Plaintiffs were adult resident citizens of Harrison
County, Mississippi, who lived at 608 Lewis Avenue, Gulfport, Mississippi.

2.      Defendant USAA CIC is a stock company wholly owned by United Services
Automobile Association, which is a Delaware corporation domiciled in the State of Texas, with
its principal office and place of business located at 9800 Fredericksburg Road, San Antonio,
Texas 78288, and which may be served with process by service on its agent for service of
process Robert S. Addison, 4400 Old Canton Road, Suite 400, Jackson, Mississippi 39211, or on

the Mississippi Insurance Commissioner, P.O. Box 79, Jackson, Mississippi, 39205-0079,

pursuant to Mississippi Code Annotated §83-21-1.

     3.     Defendants John Does 1-10 are entities affiliated with Defendants and/or who

have acted in concert with Defendants and whose identities are currently unknown. All

allegations and claims asserted herein against Defendants are incorporated herein by reference

against John Does 1-10. Said John Does, when their identities are known, will be identified by

name and joined in this action, if necessary, pursuant to the Mississippi Rules of Civil Procedure.

## II.
## SUBJECT MATTER AND PERSONAL JURISDICTION

     4.     This Court has jurisdiction over the subject matter and Defendants in this case

pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiffs

and Defendants and the amount in controversy exceeds $75,000.00.

## III.
## VENUE

     5.     Venue in this cause is proper in this Court pursuant to 28 U.S.C. §1391, because

this suit respects real and personal property which is within the Southern District of Mississippi.

This suit also respects conduct, acts and/or omissions of the Defendants which occurred within

the Southern District of Mississippi.

## IV.
## FACTS

     6.     Plaintiffs purchased from Defendants a standard Homeowner's Policy. A copy of

the subject policy is attached as Exhibit "A" to this Complaint. Plaintiffs' Policy was in effect

on August 29, 2005.

7.    The subject policy provides "all risk" coverage for all "direct physical loss" to Plaintiffs' "Dwelling" and "Other Structures" unless the proximate and efficient cause of the loss is one that is expressly excluded by the policy, stating as follows:

> COVERAGE A - DWELLING and
> COVERAGE B - OTHER STRUCTURES
> We insure against risks of *direct, physical loss* to property described in Coverages A and B;
>
> . . .

8.    This broad "all risk" coverage includes coverage for loss proximately and efficiently caused by hurricane wind as well as for *objects* driven by the hurricane wind and/or hurricane storm surge.

9.    The subject policy also provides coverage for "direct physical loss" to Plaintiffs' "Personal Property" proximately and efficiently caused by a Hurricane, which is considered a "windstorm," stating as follows:

> COVERAGE C - PERSONAL PROPERTY
> We insure for *direct physical loss* to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I – EXCLUSIONS.
>
> . . .
>
> 2.  Windstorm or hail.

10.    The subject policy further provides coverage for a "Collapse" of the Plaintiffs' Dwelling, Other Structures and/or Personal Property proximately and efficiently caused by hurricane wind and/or water borne debris impacting the Plaintiffs' properties.

11.    In the late 1990's, DEFENDANTS effected a mandatory modification of the policy raising the deductible for hurricane-caused losses. DEFENDANTS subjected Plaintiffs and other policyholders to more risk of loss from hurricanes through the "Wind and Hail"

3

Deductible ("Hurricane Deductible") of 1% or more of the subject policy, to ensure coverage for any and all damage to Plaintiffs' insured property proximately caused by a hurricane, above the deductible limit.

12.    During the time Plaintiffs' policy was in effect, DEFENDANTS requested and received premium rate increases and/or retained risk (deductible) increases for Plaintiffs' policies from the Mississippi Department of Insurance. Said increases were justified by DEFENDANTS by the hurricane risks associated with Coastal properties. DEFENDANTS utilized hurricane-specific experience ratings and computer model projections of hurricane losses to corroborate their demands for such rate increases. DEFENDANTS did not distinguish or differentiate between hurricane wind and water perils in requesting and setting these rate increases.

13.    For such coverage, Plaintiffs agreed and paid DEFENDANTS annual premiums. Plaintiffs also agreed to pay the Hurricane Deductible to ensure insurance coverage for any and all accidental direct physical loss caused by a hurricane above the deductible limit, including all damage proximately and efficiently caused by hurricane wind.

14.    Plaintiffs purchased their policies from DEFENDANTS for, *inter alia,* the express and primary purpose of insuring against any accidental direct physical loss that could proximately and efficiently result from hurricanes impacting the Mississippi Gulf Coast.

15.    On August 29, 2005, within the periods of coverage of the subject policies, the insured "Dwelling" and "Other Structures" (hereafter "dwelling") and the "Personal Property" of Plaintiffs were significantly damaged and destroyed by Hurricane Katrina. These were "direct physical losses" covered under the subject policies.

4

16.    The "direct physical loss" Plaintiffs' insured property sustained was proximately and efficiently caused by covered events that occurred in the absence of water, thereby triggering full coverage for all Plaintiffs' hurricane losses.

17.    Hurricane Katrina's devastating and catastrophic wind activity occurred 4-6 hours before the peak hurricane storm surge, and completely destroyed Plaintiffs' property prior to the arrival of any storm surge.

18.    The meteorological and physical evidence at the site of the insured property and the accounts of eyewitnesses also establish that the insured property was completely destroyed by wind activity prior to any storm surge.

19.    In accordance with policy provisions, Plaintiffs notified DEFENDANTS of their "direct physical losses."

20.    However, DEFENDANTS failed to fairly, adequately, and sufficiently investigate or adjust Plaintiffs' losses.

21.    Based on its inadequate claims investigation and adjustment and, in certain instances, engineering reports that were speculative, inadequate, and inconclusive concerning the extent to which Plaintiffs' losses were caused by water or water-borne debris, if any, and how much of the losses were caused by hurricane wind, DEFENDANTS denied Plaintiffs' claims for hurricane damage and failed to pay Plaintiffs for the amount of their losses that it could not prove was caused by hurricane water. In denying Plaintiffs' claims, DEFENDANTS cited their "water damage" exclusion and the "anti-concurrent cause clause," which state as follows:

> 1.    We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
>    c.    **Water Damage**, meaning:

       (1)    flood, surface water, waves, tidal water, overflow of
                a body of water, or spray from any of these, whether
                or not driven by wind.

22.    DEFENDANTS' anti-concurrent causation clause is ambiguous and unenforceable. DEFENDANTS' reliance on the above-cited ambiguous and unenforceable anti-concurrent causation clause to deny Plaintiffs' hurricane claim was negligent, grossly negligent, a breach of the subject contract of insurance, a breach of the duty of good faith and fair dealing and a tortious breach of the subject contract.

23.    DEFENDANTS denied Plaintiffs' insurance claims even though they failed as a matter of fact and Mississippi law to: (1) sufficiently investigate the claims; (2) carry their affirmative burden of establishing by a preponderance of the evidence at the time of the denial that Plaintiffs' losses were proximately and efficiently caused by "Water Damage" as defined in the exclusion; (3) carry their affirmative burden of establishing by a preponderance of the evidence at the time of the denial the amount of Plaintiffs' losses caused by "water", the amount caused by wind, and the amount caused by water-borne debris; or (4) pay Plaintiffs for the amount of their losses that DEFENDANTS could not prove by a preponderance of the evidence was caused by "water." As a result of DEFENDANTS' failures, Mississippi law precludes reliance on the anti-concurrent causation exclusion or the "water damage" exclusion and raises a duty to pay Plaintiffs for the full amount of their losses. DEFENDANTS' failure to pay Plaintiffs all insurance proceeds promptly upon completion of their alleged investigations is without legitimate or arguable reason in fact or law.

24.    Although Plaintiffs fulfilled any and all obligations imposed upon them under their Policy, DEFENDANTS failed to properly pay Plaintiffs for all loss or damage to Plaintiffs' dwelling and personal property contained therein. Plaintiffs should have received payment for

6

general contractor's overhead and profit with their initial payment from DEFENDANTS. Although the services of a general contractor were anticipated and required because of the loss and damage to Plaintiffs' dwelling, DEFENDANTS made no payment to Plaintiffs for general contractor's overhead and profit.   DEFENDANTS frequently and arbitrarily fail to make payments for general contractor's overhead and profit when paying their insureds' claims for loss or damage to dwellings in Mississippi and throughout the United States.

25.   DEFENDANTS' investigations, adjustments, and denials of Plaintiffs' claims were negligent, grossly negligent, and reckless.   DEFENDANTS' denials of coverage for Plaintiffs' losses breached the subject contract of insurance.   Such conduct also constitutes bad faith and tortious breach of contract and breached the duty of good faith and fair dealing.

**V.**

## COUNT ONE
### NEGLIGENCE/GROSS NEGLIGENCE/RECKLESS DISREGARD FOR RIGHTS OF PLAINTIFFS

26.   Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

27.   DEFENDANTS had a duty under Mississippi law to fully, fairly, adequately and correctly investigate and adjust Plaintiffs' claims for hurricane damage.

28.   DEFENDANTS breached this duty by failing to adequately investigate and adjust Plaintiffs' claims for hurricane damage.

29.   DEFENDANTS breached this duty by denying Plaintiffs' claims without meeting the affirmative burden of proving at the time of the denial by a preponderance of the evidence that Plaintiffs' losses were proximately and efficiently caused by "water damage," a peril excluded by the policy.

7

30.    DEFENDANTS breached this duty by denying Plaintiffs' claims without meeting the affirmative burden of establishing at the time of the denial by a preponderance of the evidence which amount of Plaintiffs' losses was caused by "water" or other excluded activity as defined in the subject insurance policies and which amount was caused by wind or other covered activity.

31.    Similarly, DEFENDANTS breached this duty by failing to pay Plaintiffs for the damage it could not prove by a preponderance of the evidence was caused by "water."

32.    DEFENDANTS breached this duty by shifting to Plaintiffs the burden of proving that their loss was not excluded by the policy.

33.    DEFENDANTS breached this duty by dispatching adjusters to investigate, adjust, and deny Plaintiffs' losses who did not have the qualifications or training to determine the cause of Plaintiffs' losses.

34.    DEFENDANTS breached this duty by failing to properly train their adjusters on how to investigate and adjust Plaintiffs' losses.

35.    DEFENDANTS breached this duty by basing the denial of Plaintiffs' claims for hurricane damage on the investigation and adjustment of unqualified adjusters.

36.    DEFENDANTS breached this duty by failing to adequately inspect, investigate or adjust the insured property prior to denying the claims, including by failing to compensate Plaintiffs for general contractor's overhead and profit.

37.    DEFENDANTS breached this duty by denying coverage for Plaintiffs' losses without conducting a complete, adequate, full, and fair investigation and adjustment of Plaintiffs' claims for damage under the subject policies.

8

38.    DEFENDANTS breached this duty by failing to credit any available statements from eyewitnesses in investigating and adjusting Plaintiffs' claims.

39.    DEFENDANTS breached this duty by failing to utilize objective meteorologists or structural engineers to determine the cause of Plaintiffs' losses prior to denying their claims.

40.    In claims where such engineering reports were utilized, DEFENDANTS breached this duty by denying Plaintiffs' claims on the basis of scientifically unreliable engineering reports.

41.    DEFENDANTS breached this duty by relying on unreliable meteorological data and mischaracterizing, perverting and ignoring valid meteorological data and eyewitness accounts in denying the claims.

42.    DEFENDANTS breached this duty by denying Plaintiffs' claims without knowing what caused the losses or undertaking any effort to ascertain what caused the losses.

43.    DEFENDANTS breached this duty by failing to pay Plaintiffs for their hurricane losses caused by hurricane wind, wind-driven debris, and water-borne debris.

44.    DEFENDANTS breached this duty by relying on an ambiguous and unenforceable anti-concurrent causation clause to improperly deny Plaintiffs' claim.

45.    Such conduct as alleged above constitutes negligence, gross negligence, and/or reckless disregard for Plaintiffs' rights as DEFENDANTS' insureds.

46.    DEFENDANTS' negligent, grossly negligent, and/or reckless adjustment proximately caused Plaintiffs' economic and emotional damages.

## COUNT TWO
### BREACH OF CONTRACT AGAINST DEFENDANTS

47.    Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

48.    Plaintiffs entered into an insurance contract with DEFENDANTS in which they contracted for, purchased, and were entitled to receive full insurance coverage for all "direct physical loss" or "collapse" to the insured Dwelling, as well as loss of use. Plaintiffs similarly contracted for insurance coverage for all "accidental direct physical loss" to their personal contents proximately and efficiently caused by hurricane wind.

49.    Plaintiffs suffered a "direct physical loss."

50.    The overwhelming meteorological and physical evidence at the site of the insured property, the surrounding area, and evidence provided by eyewitnesses established that the insured property was proximately and efficiently damaged by wind activity in the absence of and prior to the arrival and inundation of any storm surge.

51.    Plaintiffs satisfied their obligations by submitting a claim showing that they sustained a "direct physical loss." However, DEFENDANTS breached the subject policy by unjustifiably denying insurance coverage for Plaintiffs' insured losses in the following ways:

52.    DEFENDANTS breached their contractual obligations by denying Plaintiffs' claim without meeting their affirmative burden of proving at the time of the denial by a preponderance of the evidence that Plaintiffs' direct losses were proximately and efficiently caused by "water damage," a peril excluded by the policy.

53.    DEFENDANTS breached their contractual obligations by denying Plaintiffs' claims without meeting their affirmative burden of establishing at the time of the denial by a preponderance of the evidence which amount of Plaintiffs' loss was caused by "water" and which amount was caused by wind.

10

54.    Similarly, DEFENDANTS breached their contract by failing to pay Plaintiffs for the damage they could not prove by a preponderance of the evidence was caused by "water."

55.    DEFENDANTS breached their insurance contract by shifting to Plaintiffs the burden of proving that their losses were not excluded by the policy.

56.    DEFENDANTS breached their insurance contracts by denying Plaintiffs claim for hurricane damages without being able to meet their burden of proving by a preponderance of the evidence that Plaintiffs losses were not caused by covered wind activity.

57.    DEFENDANTS breached their insurance contract by failing to conclusively and objectively determine the proximate and efficient cause of the losses prior to their denial of Plaintiffs' claim for hurricane damage.

58.    DEFENDANTS breached their insurance contract by denying Plaintiffs' claim for hurricane damage without being able to conclusively and objectively determine the proximate and efficient cause of the losses.

59.    DEFENDANTS breached their insurance contract by basing the denial of Plaintiffs' claim on a nonobjective and scientifically unreliable engineering report.

60.    DEFENDANTS breached their insurance contract by intentionally relying on unreliable meteorological data and mischaracterizing, perverting, and ignoring valid meteorological data and eyewitness accounts in denying the claim.

61.    DEFENDANTS breached their insurance contract by basing the denial of Plaintiffs' claim on engineering reports that were speculative, inconsistent and inconclusive as to whether the damage to the insured property was proximately and efficiently caused by wind.

11

62.    DEFENDANTS breached their insurance contract by denying Plaintiffs' claim for hurricane damage despite the overwhelming evidence from the insured property, surrounding area, and eyewitnesses that the losses were caused by wind activity.

63.    DEFENDANTS breached their insurance contract by unfairly treating and adjusting Plaintiffs' claim for hurricane damage differently than the few other similar claims for hurricane damage that it did provide coverage for and pay according to the terms of the insurance contract.

64.    DEFENDANTS breached their insurance contract by negligently, grossly negligently, and/or recklessly failing to conduct an adequate, proper, honest, and good faith inspection, adjustment, and investigation of Plaintiffs' claim for hurricane damage prior to denying such claim.

65.    DEFENDANTS breached their insurance contract by denying Plaintiffs' claim for hurricane damage without conducting adequate, proper, honest, and good faith adjustments, inspections, and investigations of Plaintiffs' claim for hurricane damage.

66.    DEFENDANTS breached their insurance contract by basing the denial of Plaintiffs' claim for hurricane damage on inadequate investigations and inspections, and adjustments of Plaintiffs' losses.

67.    DEFENDANTS breached their insurance contract by basing the denial of Plaintiffs' claim for hurricane damage on investigations, inspections and adjustments of adjusters who were unqualified to determine the proximate cause of the losses.

68.    DEFENDANTS breached their insurance contract by failing to utilize objective meteorologists or engineers to determine the proximate cause of the losses prior to denying Plaintiffs' claims for hurricane damage.

12

69.    DEFENDANTS breached their insurance contract by failing to construe the applicable insurance policy in favor of coverage for Plaintiffs' losses caused by hurricane wind, wind-driven debris, and water-borne debris.

70.    DEFENDANTS breached their insurance contract by relying on an ambiguous and unenforceable anti-concurrent causation clause to improperly deny Plaintiffs' claim.

71.    DEFENDANTS breached their insurance contract by failing to pay Plaintiffs general contractor's overhead and profit, which was owed under the contract.

72.    DEFENDANTS' breaches of contract have proximately caused Plaintiffs' economic and emotional damages.

## COUNT THREE
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS

73.    Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

74.    DEFENDANTS breached the duty of good faith and fair dealing by unjustifiably denying the insurance coverage for Plaintiffs' insured losses in the following ways:

75.    DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims without meeting the affirmative burden of proving at the time of the denials by a preponderance of the evidence that Plaintiffs' direct physical losses were proximately and efficiently caused by "water damage," a peril excluded by the policy.

76.    DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims without meeting the affirmative burden of establishing at the time of the denials by a preponderance of the evidence which amount of Plaintiffs' losses was caused by "water" and which amount was caused by wind.

77.     Similarly, DEFENDANTS breached the duty of good faith and fair dealing by failing to pay Plaintiffs for the damage they could not prove by a preponderance of the evidence was caused by "water."

78.     DEFENDANTS breached the duty of good faith and fair dealing by shifting to Plaintiffs the burden of proving that their losses were not excluded by the policy.

79.     DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims for hurricane damages without being able to meet the burden of proving by a preponderance of the evidence that Plaintiffs' losses were not caused by covered wind activity.

80.     DEFENDANTS breached the duty of good faith and fair dealing by failing to conclusively and objectively determine the proximate and efficient cause of the losses prior to the denial of Plaintiffs' claims for hurricane damage.

81.     DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims for hurricane damage without being able to conclusively and objectively determine the proximate and efficient cause of the losses.

82.     DEFENDANTS breached the duty of good faith and fair dealing by basing the denial of Plaintiffs' claims on nonobjective and scientifically unreliable engineering reports.

83.     DEFENDANTS breached the duty of good faith and fair dealing by intentionally relying on unreliable meteorological data and mischaracterizing, perverting and ignoring valid meteorological data and eyewitness accounts in denying the claims.

84.     DEFENDANTS breached the duty of good faith and fair dealing by basing their denial of Plaintiffs' claim on engineering reports that were speculative, inconsistent and inconclusive as to whether the damage to the insured property was proximately and efficiently caused by wind.

14

85.   DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims for hurricane damage despite the overwhelming evidence from the insured property, surrounding area and eyewitnesses that the losses were caused by wind activity.

86.   DEFENDANTS breached the duty of good faith and fair dealing by unfairly treating and adjusting Plaintiffs' claims for hurricane damage differently than the few other similar claims for hurricane damage that they did provide coverage for and pay.

87.   DEFENDANTS breached the duty of good faith and fair dealing by negligently, gross negligently, and/or recklessly failing to conduct adequate, proper, honest, and good faith inspections, adjustments and investigations of Plaintiffs' claims for hurricane damage prior to denying such claims.

88.   DEFENDANTS breached the duty of good faith and fair dealing by denying Plaintiffs' claims for hurricane damage without conducting adequate, proper, honest, and good faith inspections, adjustments and investigations of Plaintiffs' claims for hurricane damage under the policy.

89.   DEFENDANTS breached the duty of good faith and fair dealing by basing their denials of Plaintiffs' claims for hurricane damage on inadequate investigations, inspections, and adjustments of Plaintiffs' losses.

90.   DEFENDANTS breached the duty of good faith and fair dealing by relying on an ambiguous and unenforceable anti-concurrent causation clause to improperly deny Plaintiffs' claim.

91.   DEFENDANTS breached the duty of good faith and fair dealing by failing to pay Plaintiffs for general contractor's overhead and profit, which was owed under the contract.

15

92.    DEFENDANTS breached the duty of good faith and fair dealing by its basing denials of Plaintiffs' claims for hurricane damage on the investigations, inspections and adjustments of adjusters who were unqualified to determine the proximate cause of Plaintiffs' losses.

93.    DEFENDANTS breached the duty of good faith and fair dealing by failing to utilize objective meteorologists or engineers to determine the proximate cause of the losses prior to denying Plaintiffs' claims for hurricane damage.

94.    DEFENDANTS breached the duty of good faith and fair dealing by failing to construe its policy in favor of coverage for Plaintiffs' insured losses caused by hurricane wind, wind-driven debris, and water-borne debris.

95.    Such conduct by DEFENDANTS violates standards of decency, fairness, and reasonableness.

96.    DEFENDANTS' breaches of the duty of good faith and fair dealing in honoring its contract with the Plaintiffs has proximately caused economic and emotional damages that are compensable under Mississippi precedent.

## COUNT FOUR
### BAD FAITH AND TORTIOUS BREACH OF CONTRACT

97.    Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

98.    DEFENDANTS tortiously, maliciously and in bad faith breached the subject policy by refusing to provide full insurance coverage under the subject policy for Plaintiffs' hurricane losses without a legitimate or arguable reason in fact or law.

99.    DEFENDANTS tortiously, maliciously and in bad faith breached the subject policy by denying Plaintiffs' claims without meeting the affirmative burden of proving at the

time of the denial by a preponderance of the evidence that Plaintiffs' direct physical losses were proximately and efficiently caused by "water damage," a peril excluded by the policy.

100.   DEFENDANTS tortiously, maliciously and in bad faith breached the subject policy by denying Plaintiffs' claims without meeting the affirmative burden of establishing at the time of the denials by a preponderance of the evidence which amount of Plaintiffs' losses were caused by "water" and which amount was caused by wind.

101.   Similarly, DEFENDANTS tortiously, maliciously and in bad faith breached the subject policy by failing to pay Plaintiffs for the damage they could not prove by a preponderance of the evidence was caused by "water."

102.   DEFENDANTS tortiously, maliciously and in bad faith breached the subject policy by shifting to Plaintiffs the burden of proving that their loss was not excluded by the policy.

103.   DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by denying Plaintiffs' claims for hurricane damages without being able to meet its burden of proving by a preponderance of the evidence that Plaintiffs' losses were not caused by covered wind activity.

104.   DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by failing to conclusively and objectively determine the proximate and efficient cause of the losses prior to denial of Plaintiffs' claims for hurricane damage.

105.   DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by denying Plaintiffs' claims for hurricane damage

without being able to conclusively and objectively determine the proximate and efficient cause of the losses.

106.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by basing its denial of Plaintiffs' claims on nonobjective and scientifically unreliable engineering reports.

107.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by intentionally relying on unreliable meteorological data and mischaracterizing, perverting and ignoring valid meteorological data and eyewitness accounts in denying the claims.

108.    DEFENDANTS  tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by basing their denial of Plaintiffs' claims on engineering reports that were speculative, inconsistent and inconclusive as to whether the damage to the insured property was proximately and efficiently caused by wind.

109.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by denying Plaintiffs' claims for hurricane damage despite the overwhelming evidence from the insured properties, surrounding area, and eyewitnesses that the losses were caused by wind activity.

110.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by unfairly treating and adjusting Plaintiffs' claims for hurricane damage differently than the few other similar claims for hurricane damage that they did provide coverage for and pay.

111.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by negligently, gross negligently, and/or recklessly

failing to conduct adequate, proper, honest, and good faith inspections, adjustments and investigations of Plaintiffs' claims for hurricane damage prior to denying such claims.

112.    DEFENDANTS tortious, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by relying on an ambiguous and unenforceable anti-concurrent causation clause to improperly deny Plaintiffs' claim.

113.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by failing to pay Plaintiffs for general contractor's overhead and profit.

114.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by denying Plaintiffs' claims for hurricane damage without conducting adequate, proper, honest, and good faith inspections, adjustments and investigations of Plaintiffs' claims for hurricane damage.

115.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by basing its denial of Plaintiffs' claim for hurricane damage on inadequate investigations, inspections, and adjustments of Plaintiffs' loss.

116.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by basing its denial of Plaintiffs' claims for hurricane damage on the inspections, investigations and adjustments of adjusters who were unqualified to determine the proximate cause of the losses.

117.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by failing to utilize objective meteorologists or engineers to determine the proximate cause of the losses prior to denying Plaintiffs' claims for hurricane damage.

118.    DEFENDANTS tortiously, maliciously and in bad faith without a legitimate or arguable reason breached the subject policy by failing to construe the policy in favor of coverage for Plaintiffs' insured losses.

119.    DEFENDANTS' tortious, malicious and bad faith breaches of contract have proximately caused Plaintiffs' economic and emotional damages.

120.    DEFENDANTS' acts and conduct as alleged above were wilful, wanton, malicious, grossly negligent, and done with reckless disregard for the rights of Plaintiffs, thereby rising to the level of an independent tort and entitling Plaintiffs to an award of punitive damages.

## COUNT FIVE
### WAIVER & ESTOPPEL

121.    Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

122.    DEFENDANTS had the obligation and duty to establish what, if any, part of Plaintiffs' losses fell under the terms of their policy exclusions. By declaring the burden of proof irrelevant and intentionally abandoning the burden of establishing what, if any, part of the losses was excluded and thereby shifting the burden of proof to Plaintiffs, DEFENDANTS waived their right to exclude any part of the losses.

123.    DEFENDANTS denied Plaintiffs' claims for hurricane damage based on speculative, inconclusive, inconsistent, scientifically invalid and non-objective engineering reports. DEFENDANTS have therefore waived the right to utilize and/or rely on new or different engineers and/or meteorologists now to "mend the hold" or legitimize the basis for the denials after the fact, and should be estopped from doing so now.

124.    DEFENDANTS' conduct and denial constitutes a waiver of the right to now inspect the insured properties; reinvestigate the causes of loss; or utilize engineers and/or meteorologists to do what should have been done prior to the denials. DEFENDANTS therefore waived the right to make any causal determination of the losses now that the matter is in litigation, and should be estopped from being able to conduct any kind of post-denial investigations, inspections of the insured properties, or utilization of different litigation experts to now determine the cause of the losses and "clean up" its adjustment process. DEFENDANTS should further be estopped from using litigation experts to now determine the cause of loss and justify its invalid denials.

## VI.
### JURY DEMAND

125.    Plaintiffs respectfully demand a trial by jury on all issues so triable.

## VII.
### REMEDIES

126.    Plaintiffs hereby incorporate and adopt by reference each and every allegation set forth in all foregoing Paragraphs of the Complaint.

127.    As a direct and proximate result of DEFENDANTS' negligence, gross negligence, reckless disregard for Plaintiffs' rights as DEFENDANTS' insureds, breach of contract, breach of duty of good faith and fair dealing, bad faith and tortious breach of contract without a legitimate or arguable reason in fact or law, Plaintiffs are entitled to the following relief:

(A)    Payment for all contractual benefits for all coverages afforded to Plaintiffs under the subject policy for damage to their insured residence and personal contents

21

caused by Hurricane Katrina, with interest on all amounts due Plaintiffs under their policies;

(B)    With respect to "Additional Living Expenses" benefits owing under the policy, Defendant should be ordered to immediately pay all such benefits retroactive to August 29, 2005, with interest on all past-due amounts, and pay such benefits prospectively to the limits of coverage or the insured is no longer entitled to them;

(C)    Prejudgment interest on the amounts owing to Plaintiffs in contractual or policy benefits with interest, retroactive to August 29, 2005;

(D)    Compensatory damages on the tort claims for mental distress, emotional harm, and other losses and damages suffered by Plaintiffs as a proximate result on the denial of coverage and attendant breach of contract, all of which falls under the *Veasley* doctrine.    Plaintiffs are entitled on their contract claims to consequential damages, including but not limited to the amounts Plaintiffs expended or lost in trying to subsist without insurance benefits since August 29, 2005.  On all claims Plaintiffs are entitled to recovery for humiliation, stigmatization in the Plaintiffs communities, embarrassment, and mental distress proximately caused by DEFENDANTS' bad faith denial of their claim.

(E)    For the intentionally tortious actions of DEFENDANTS, compensatory damages as described above, and further provided under Mississippi law, and Plaintiffs are entitled to recovery of their attorney fees and costs of litigation for such intentional acts committed by DEFENDANTS.

(F)    Extra-contractual damages for DEFENDANTS' tortious, malicious, wilful, wanton, reckless, grossly negligent, and bad faith conduct, which arose to the

22

level of an independent tort, including but not limited to, compensatory damages for all out-of-pocket expenses incurred by reason of DEFENDANTS' refusal to pay contractual benefits, mental distress and/or emotional harm caused or contributed to by Defendants' bad faith refusal to honor their contracts of insurance, and pursuant to *Veasley* recovery of attorney fees and litigation expenses incurred by Plaintiffs by reason of Defendants denial of insurance coverage, including mental distress, all out-of-pocket expenses and attorney fees and expenses incurred by Plaintiffs.

(G)    Punitive and exemplary damages for DEFENDANTS' tortious, malicious, wilful, wanton, reckless, grossly negligent, and bad faith conduct which arose to the level of an independent tort, including but not limited to, an award of punitive damages sufficient to punish and deter DEFENDANTS and to discourage other insurers from engaging in such misconduct, taking into account DEFENDANTS' financial condition, all in an amount sufficient to achieve the public purposes underlying an award of punitive damages as may be determined by the Court and/or jury; prejudgment interest on all amounts in contractual benefits and compensatory damages awarded by the Court and/or jury; and all costs of the litigation, including but not limited to reasonable attorney fees, incurred in prosecuting this action and any subsidiary or auxiliary actions that arise in determining the losses of the individual Plaintiffs by reason of the non-payment of contractual benefits, in an amount to be determined by the Court following conclusion of all proceedings herein.

(H)    An Order estopping DEFENDANTS from now inspecting the insured property or determining the cause of loss based on its denial and post-denial conduct.

128.    Plaintiffs respectfully requests such further general or specific relief to which they are entitled at law or in equity.

## VIII.

## CLASS ALLEGATIONS

129. All previous paragraphs are hereby incorporated as if fully set forth herein.

130. Members of the Class (collectively "Class Plaintiffs" or "Class Members" hereafter) alleged herein should have received payment for general contractor's overhead and profit with their initial payment from DEFENDANTS. Although the services of a general contractor were anticipated and required because of the loss and damage to Class Plaintiffs' dwellings, DEFENDANTS made no payment for general contractor's overhead and profit to Class Plaintiffs.    DEFENDANTS frequently and arbitrarily fail to make payment for general contractor's overhead and profit when paying their insureds' claims for loss or damage to dwellings in Mississippi and throughout the United States.

131. Plaintiffs bring certain claims in this lawsuit on behalf of themselves, and all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.    The Class that Plaintiffs seek to represent consists of:

> Any and all USAA insureds who received payments, directly or indirectly, from USAA for physical loss or damage to their dwelling, such dwelling located in the United States, at any time between August 15, 1998, and the date of class certification but who were not compensated for general contractor's overhead and profit.    Excluded from the Class is/are: (1) USAA and all directors, officers, employees, partners, principals, shareholders and agents of USAA; (2) Persons or entities who timely opt-out of this proceeding using the correct protocol for "opting-out" that is formally established by this Court; (3) any and all Federal, State and/or Local Governments, including, but not limited to, their Departments, Agencies, Divisions, Bureaus, Boards, Sections, Groups, Councils and/or any other subdivision, and any claim that such governmental entities may have directly or indirectly; (4) Any currently-sitting Federal Court Judge or Justice, and the current spouse and all other persons within the third degree of consanguinity to such judge/justice; and (5) Plaintiff's Counsel.

132. If the Court should determine not to certify a nationwide class, then in the alternative, Plaintiffs seek certification of a Mississippi-only class. The class action section of this lawsuit seeks to address USAA's frequent and arbitrary practice of failing to pay overhead and profit on property damage claims in Mississippi and throughout the United States and concealing from USAA insureds, including Class Plaintiffs, that such payments were owed under their USAA insurance contract.

133. The Class comprises thousands of individuals who are geographically dispersed across the United States and across Mississippi. Joinder of the Class is impractical and the disposition of each Class Plaintiff's claims in a class action will provide substantial benefit to each Class Plaintiff and the Court system. The identities of Class Plaintiffs can be ascertained from USAA's records, either manually or through computerized searches.

134. Questions of law and fact common to the Class predominate over any questions affecting only individual Class Plaintiffs. The common questions of law and fact include:

a. Whether USAA has a duty to adequately, fully, and fairly investigate and adjust the Class Members' insurance claims;

b. Whether USAA has a duty to disclose material facts and information to Class Members;

c. Whether Class Members are entitled to payment of general contractor's overhead and profit in connection with loss or damage to their dwelling;

d. Whether Class Members are entitled to request payment for general contractor's overhead and profit in connection with loss or damage to their dwelling;

e. Whether USAA failed to pay Class Members general contractor's overhead and profit in connection with loss or damage to their dwelling;

f. Whether USAA improperly retained for itself monies that should have been paid to Class Members for general contractor's overhead and profit;

25

g. Whether USAA notified Class Members of its policies and procedures regarding general contractor's overhead and profit;

h. Whether USAA was unjustly enriched to the detriment of the Class Members through its retention of monies that should have been paid to Class Members as general contractor's overhead and profit;

i. Whether USAA's conduct in connection with the overhead and profit scheme constituted a tortious breach of Class Members' USAA insurance contract;

j. Whether restitution is an appropriate remedy for Class Members;

k. Whether disgorgement is an appropriate remedy for Class Members;

l. Whether Class Members are entitled to money damages for USAA's wrongful conduct;

m. Whether Class Members are entitled to an injunction requiring USAA to disclose to all Class Members that they are entitled to submit a supplemental or additional request for payment for general contractor's overhead and profit in connection with any previous loss or damage to a dwelling;

n. Whether Class Members are entitled to an injunction requiring USAA to disclose to all insureds in the future that such insureds may be entitled to general contractor's overhead and profit in connection with loss or damage to a dwelling.

135. The claims asserted by Plaintiffs are typical of the Class claims. Plaintiffs are USAA insureds. Plaintiffs received payment from DEFENDANTS for loss or damage to a dwelling. In connection with payment from DEFENDANTS for loss or damage to a dwelling, DEFENDANTS failed to pay Plaintiffs any amount for general contractor's overhead and profit ("O and P" sometimes hereafter). In mishandling Plaintiffs' claim as aforesaid, DEFENDANTS treated Plaintiffs in the same way that it treated all the Class Plaintiffs who had claims that entitled them to O & P but were not paid for O & P. *See* Plaintiff's USAA Adjuster Report and Repair/Replacement Cost Statement attached as Exhibit "B."

136. Plaintiffs will fairly and adequately represent the interests of the Class. The interests of the Class are coincident with and not antagonistic to those of Plaintiffs. Further, Plaintiffs have the ability to assist, intelligently, in the decision-making in connection with the litigation.

And Plaintiffs are represented by legal counsel who are both competent and experienced in this type of class action litigation.

137. DEFENDANTS' conduct in withholding payment of O & P in connection with the loss of or damage to a dwelling was consistent with policies and practices that are common to all Class Members. Consequently, common question of law and fact will predominate.

138. This Class Action is not only an appropriate method for the fair and efficient adjudication of this controversy but is, in fact, superior to all other available methods because:

> a. Joiner of the thousands of geographically diverse individual Class Members is impracticable, cumbersome and unduly burdensome;

> b. Class Members have no special or unique interest in individually controlling the prosecution of separate actions;

> c. Class Members' individual claims may be relatively modest when compared to the expense of litigating each Member's claim, thus making it impracticable, unduly burdensome and expensive, if not practically impossible, for individual Class Members to obtain redress for their loss;

> d. When the Defendant's liability has been adjudicated, claims of all Class Members can be determined by the Court and administered efficiently and in a manner far less onerous and burdensome than if attempted through the filing of individual lawsuit;

> e. This Class Action will promote an orderly and expeditious adjudication and administration of Class claims, and promote economies of time, effort and resources;

> f. This Class Action will assure uniformity of decisions among Class Members;

> g. Without this Class Action, Class Members will go without restitution or money damages;

> h. Without this Class Action, no restitution, disgorgement, or damages will be ordered and Defendant will be unjustly enriched and reap the benefits of the monies they have retained as a result of their wrongful and fraudulent conduct; and,

> i. The resolution of this controversy through this Class Action presents fewer management difficulties than individually filed lawsuits and conserves the

resources of the parties and the judicial system while protecting the rights of each Class Member.

139. Plaintiffs seek an injunction and equitable relief on behalf of Class Members. Plaintiffs seek full restitution to Plaintiffs and the Class of all amounts by which DEFENDANTS have been unjustly enriched, and Plaintiffs seek disgorgement of all DEFENDANTS' ill-gotten gains to preclude DEFENDANTS from retaining any benefit from their wrongful conduct. Plaintiffs also seek money damages.

## FRAUDULENT CONCEALMENT – TOLLING OF STATUTES OF LIMITATIONS

140. DEFENDANTS had a duty to disclose to Plaintiffs and Class Members (collectively "Class Plaintiffs" sometimes hereafter) their entitlement to general contractor's overhead and profit.

141. Rather than disclose this information, DEFENDANTS actively and fraudulently concealed DEFENDANTS' obligation to pay O & P on the Class Plaintiffs' claims.

142. Although Class Plaintiffs acted with due diligence, they were prevented from discovering their claims by DEFENDANTS' fraudulent concealment. DEFENDANTS' fraudulent concealment tolls the running of any applicable statute of limitations.

## EQUITABLE ESTOPPEL – EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

143. DEFENDANTS concealed from Class Plaintiffs their entitlement to general contractor's overhead and profit.

144. DEFENDANTS' concealment prevented Class Plaintiffs from ascertaining that they were entitled to general contractor's overhead and profit and from asserting their rights.

145. The statute of limitations applicable to Class Plaintiffs' claims should be equitably tolled. Alternatively, as a consequence of DEFENDANTS' concealment of Class Plaintiffs'

entitlement to general contractor's overhead and profit, DEFENDANTS should be equitably estopped from asserting a statute of limitations as a defense to any of the Class Plaintiffs' claims.

## MISCELLANEOUS

146. Any condition precedent to the institution of this lawsuit has been performed, has occurred, or has been waived.

147. By filing this lawsuit, Plaintiffs neither intend to, nor in fact did, waive or release any right, claim, action, cause of action, or defense, nor do Plaintiffs make any election of remedies they may now or ever have, but, rather, Plaintiffs expressly reserve any such right, claim, action, cause of action, and/or defense.

## COUNT ONE (CLASS CLAIM)

## TORTIOUS BREACH OF CONTRACT

148. All previous paragraphs are hereby incorporated as if set forth fully herein.

149. Class Plaintiffs each entered into an insurance contract with DEFENDANTS, by which DEFENDANTS agreed to provide coverage to Class Plaintiffs for a direct physical loss to Class Plaintiffs' property insured under the policy.

150. Class Plaintiffs each suffered a direct physical loss to their insured property and received either payment or an offer of payment from USAA. With this payment or offer of payment, USAA purported to fully compensate each Class Plaintiff for his or her loss.

151. However, DEFENDANTS negligently, grossly negligently, willfully, maliciously and/or intentionally breached the insurance contract with Class Plaintiffs by making payment to Plaintiffs for loss of damage to their dwelling without including any amount for general contractor's overhead and profit or by offering to make such payments, all purportedly in full and fair payment of their entire claim.

152. As a result of DEFENDANTS' negligent, grossly negligent, willful, malicious, and/or intentional breaches of contract, Class Plaintiffs suffered injuries and damages, entitling them to an award of both compensatory and punitive damages.

## COUNT TWO (CLASS CLAIM)

## UNJUST ENRICHMENT

153. All previous paragraphs are hereby incorporated as if set forth fully herein.

154. DEFENDANTS made payment to Class Plaintiffs for loss or damage to their dwellings without including any amount for general contractor's overhead and profit. DEFENDANTS' conduct in this respect is unfair, unjust, deceitful, wrongful, misleading and/or fraudulent.

155. Class Plaintiffs were entitled to payment of general contractor's overhead and profit. DEFENDANTS' conduct in this respect is unfair, unjust, deceitful, wrongful, misleading and/or fraudulent.

156. DEFENDANTS took unfair and/or undue advantage of Class Plaintiffs by making or offering payment for loss or damage to Class Plaintiffs' dwelling without including any amount for general contractor's overhead and profit.

157. DEFENDANTS fully appreciated the enrichment and benefit accorded to it by retaining monies that should have been paid to Class Plaintiffs as general contractor's overhead and profit.

158. DEFENDANTS' retention of monies that should have been paid to Class Plaintiffs as payment for general contractor's overhead and profit acted to benefit DEFENDANTS at the express detriment of Class Plaintiffs.

159. DEFENDANTS' retention of monies that should have been paid to Class Plaintiffs as general contractor's overhead and profit under the circumstances set forth herein not only constitutes an act of misconduct, but also is patently unfair, unjust, inequitable, dishonest and fraudulent in relation to Plaintiffs.

160. For all the above stated reasons, DEFENDANTS were unjustly enriched to the express detriment and disadvantage of Class Plaintiffs.

161. DEFENDANTS should not be allowed to retain any part of the monies they should have paid to Class Plaintiffs as general contractor's overhead and profit, nor the interest earned by DEFENDANTS on the O & P wrongfully withheld.

162. DEFENDANTS should be required to pay punitive damages to Class Plaintiffs under this unjust enrichment count.

## PRAYER FOR RELIEF (CLASS CLAIMS)

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for themselves and for all Class Members for the following relief against DEFENDANTS:

a. Payment to Class Plaintiffs for all unpaid overhead and profit benefits for Class Plaintiffs' insured property, with interest on all amounts due;

b. Prejudgment and post-judgment interest on all amounts owed to Class Plaintiffs under the insurance policy from the date this lawsuit was filed until said interest is paid;

c. Compensatory damages, consequential damages and extra-contractual damages including attorney's fees Class Plaintiffs suffered as a direct, proximate or efficient result of DEFENDANTS' failure to pay overhead and profit; and

d. Punitive and exemplary damages for DEFENDANTS' negligent, tortious, intentional, willful, wanton, grossly negligent breach of contract, which rose to the level of an independent tort;

e. An injunction and equitable relief on behalf of Class Members. Class Plaintiffs seek full restitution of all amounts by which DEFENDANTS have been unjustly enriched, and Class Plaintiffs seek disgorgement of all DEFENDANTS' ill-gotten gains to preclude DEFENDANTS from retaining any benefit from its wrongful conduct. Class Plaintiffs also seek money damages.

f. All other relief this Court deems appropriate.

### JURY DEMAND

Plaintiffs demand a trial by jury on their class claims.


Respectfully submitted this the ___ day of July, 2009.

> **KEARY BURGER and PHYLLIS BURGER, PLAINTIFFS**
>
>   Dewitt M. Lovelace
> ————————————————
> Dewitt M. Lovelace
> LOVELACE LAW FIRM, PA
> The Lovelace Building, Suite 200
> 12870 U.S. Highway 98 West
> Miramar Beach , FL 32550
> 850/837-6020
> Fax: 850/837-4093
> Email: dml@lovelacelaw.com

OF COUNSEL:

Don John W. Barrett
BARRETT LAW OFFICES
P.O. Box 987
Lexington , MS 39095-0987
662/834-2376

Email: dbarrett@barrettlawoffice.com

Thomas P. Thrash - PHV
THRASH LAW FIRM
1101 Garland Street
Little Rock , AR 72201
501/374-1058
Fax: 501/374-2222
Email: tomthrash@sbcglobal.net

## CERTIFICATE OF SERVICE

I, Dewitt M. Lovelace, do hereby certify that on this the ___ day of July I delivered by

electronic service a true and correct copy of the above and foregoing document to:

W. Shan Thompson
COPELAND, COOK, TAYLOR & BUSH
P. O. Box 6020
Ridgeland , MS 39158-6020
601/856-7200
Email: sthompson@cctb.com

By: Dewitt M. Lovelace
    Dewitt M. Lovelace
    LOVELACE LAW FIRM, PA
    The Lovelace Building, Suite 200
    12870 U.S. Highway 98 West
    Miramar Beach , FL 32550
    850/837-6020
    Fax: 850/837-4093
    Email: dml@lovelacelaw.com



PAGE    1
MAIL MACH-I
14472

08/06/05

**USAA®**

# HOMEOWNERS POLICY PACKET

KEARY E BURGER
608 LEWIS AVE
GULFPORT MS 39501-1003

CIC    00152 66 82    90A                    EFFECTIVE: 08-06-05 TO: 08-06-06

## IMPORTANT MESSAGES

Refer to your Declarations Page and endorsements to verify that coverages, limits, deductibles and other policy details are correct and meet your insurance needs. Required Information forms are also enclosed for your review.

This is not a bill. Any premium charge or return for this policy will be reflected on your next regular monthly statement.
For U.S. Calls: Policy Service (800) 531-8111. Claims (800) 531-8222.
            Receive this document and others electronically. Sign up at usaa.com.

HOCS1

USAA77 00208

THIS PAGE INTENTIONALLY LEFT BLANK

USAA77 00209

PAGE   3
MATL MACH-I



# USAA CASUALTY INSURANCE COMPANY

9800 Fredericksburg Road – San Antonio, Texas 78288

## AMENDED DECLARATIONS PAGE – EFFECTIVE  08/06/05

| Named Insured and Residence Premises | Policy   Number |
|---|---|

KEARY E BURGER AND PHYLLIS A BURGER          CIC   00152 66 82  90A

608 LEWIS AVE
GULFPORT, HARRISON, MS  39501-1003

**POLICY PERIOD From:**  08/06/05    **To:**   08/06/06
(12:01 A.M. standard time at location of the residence premises)

| COVERAGES AND LIMITS OF LIABILITY | |
|---|---|
| SECTION I   A. Dwelling | $164,000 |
| C. Personal Property | $82,000 |
| D. Loss of Use  (UP TO 12 MONTHS) | $32,800 |
| SECTION II  E. Personal Liability – Each Occurrence | $100,000 |
| F. Medical Payments to Others – Each Person | $1,000 |
| Your premium has already been reduced by the following:  FIRE/BURGLARY CREDIT | $39.21 CR |
| | |
| **BASIC PREMIUM**      $1,921.05 | |

| OTHER COVERAGES AND ENDORSEMENTS | |
|---|---|
| Form and Endorsements are printed on the following page. | $196.03 |

| DEDUCTIBLES (SECTION I ONLY) | | | |
|---|---|---|---|
| We cover only that part of the loss over the deductible stated. | | | |
| WIND AND HAIL | $1,640 | (1%) | |
| ALL OTHER PERILS | $1,000 | | |
| | | DEDUCTIBLE CREDIT | $313.64 |

| TOTAL POLICY PREMIUM | $1,803.44 |
|---|---|

| THIS IS NOT A BILL. |
|---|

**In Witness Whereof, this policy is signed on** 06/30/05

**REFER TO YOUR POLICY FOR OTHER COVERAGES, LIMITS AND EXCLUSIONS.**

ATTACH THIS DECLARATION TO PREVIOUS POLICY

HO-D1 (04-93)

USAA77 00210


**USAA®**

USAA CASUALTY INSURANCE COMPANY
AMENDED DECLARATIONS PAGE - EFFECTIVE 08/06/05

| **Policy Number** | | **Policy Term:** | 08/06/05 | 08/06/06 |
|---|---|---|---|---|
| CIC | 00152 66 82 90A | | **Inception** | **Expiration** |

SPECIFICALLY LISTED BELOW ARE THE DECLARATIONS AND PREMIUMS FOR ENDORSEMENTS MADE A
PART OF THIS POLICY AT THE TIME OF ISSUE.  THE ENDORSEMENTS ARE ATTACHED STATING
TERMS AND CONDITIONS.

| IN FORCE | QR3CIC | (04-93) QUICK REFERENCE-SPECIAL FORM | |
|---|---|---|---|
| IN FORCE | HO-3R | (04-93) HOMEOWNERS SPECIAL FORM | |
| IN FORCE | ESA | (02-05) SPOUSE ACCESS ENDORSEMENT | |
| IN FORCE | HO-IDF | (07-01) IDENTITY AND FINANCIAL FRAUD COVERAGE | |
| IN FORCE | HO-MLD | (07-01) AMENDMENT TO CONTRACT PROVISIONS | |
| IN FORCE | HO-MS | (06-99) MISSISSIPPI SPECIAL PROVISIONS | |
| IN FORCE | HO-17 | (07-00) ADJUSTED BUILDING COST | |
| IN FORCE | HO-216 | (04-93) FIRE/BURGLARY PROTECTION CREDIT | |
| IN FORCE | HO-125 | (04-93) HOME PROTECTOR | $196.03 |

REASON(S) FOR CHANGE:

MISCELLANEOUS POLICY CHANGES

**HO-D2 (04-93)**          06/30/05

USAA77 00211



**USAA**
9800 Fredericksburg Road • San Antonio, Texas 78288

# SPECIAL FORM – HOMEOWNERS POLICY.
## **READ YOUR POLICY CAREFULLY**

This policy is a legal contract between you, the policyholder, and us, the insurer. And like other contracts, it contains certain duties and responsibilities of both parties to the contract. This contract consists of the Declarations page, the policy, and any applicable endorsements.

Your policy provides the coverages and amounts of Insurance shown in the Declarations with a premium.

This cover sheet provides only a brief outline of some of the important features of your policy. This is not the insurance contract and only the actual policy provisions will control. The policy itself sets forth, in detail, the rights and obligations of both you and your insurance company.

IT IS THEREFORE IMPORTANT THAT YOU READ YOUR POLICY.

## QUICK REFERENCE

| | Page |
|---|---|
| **AGREEMENT** | 1 |
| **DEFINITIONS** | |
| **SECTION I** | |
| **PROPERTY COVERAGES** | 2 |
| Dwelling | |
| Other Structures | |
| Personal Property | |
| Special Limits | |
| Property Not Covered | |
| Loss of Use | |
| Additional Coverages | |
| Debris Removal | |
| Reasonable Repairs | |
| Trees, Shrubs, Plants | |
| Fire Department Charge | |
| Property Removed | |
| Credit Card | |
| Loss Assessment | |
| Collapse | |
| Lock Replacement | |
| Refrigerated Products | |
| Land | |
| Glass | |
| Landlord's Furnishings | |
| Building Ordinance or Law | |
| Temporary Living Expense | |

| | Page |
|---|---|
| **PERILS INSURED AGAINST** | 6 |
| Dwelling and Other Structures | |
| Personal Property | |
| **EXCLUSIONS** | 8 |
| **CONDITIONS** | 9 |
| **SECTION II** | |
| **LIABILITY COVERAGES** | 12 |
| Personal Liability | |
| Medical Payments | |
| **EXCLUSIONS** | 12 |
| **ADDITIONAL COVERAGES** | 14 |
| Claims Expenses | |
| First Aid Expenses | |
| Damage to Property of Others | |
| Loss Assessment | |
| **CONDITIONS** | 15 |
| **SECTIONS I and II** | |
| **CONDITIONS** | 16 |

This policy is issued by USAA Casualty Insurance Company ("USAA CIC"), a Florida stock insurer. This is a participating policy. You are entitled to dividends as may be declared by the USAA CIC Board of Directors.

QR3CIC (04-93)

USAA77 00212

Homeowners 3R
Special Form
(04-93)
HO-93 Program

## AGREEMENT

In return for payment of premium and subject to all terms of this policy, we will provide the insurance described.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse when a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. Certain words and phrases are defined and are printed in boldface when used.

1. "bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "business" includes trade, profession or occupation.

3. "insured" means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under SECTION II, "insured" also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any business or without consent of the owner is not an insured;

   d. with respect to any vehicle or conveyance to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

      (2) other persons using the vehicle on an insured location with your consent.

4. "insured location" means:

   a. the residence premises;

   b. the part of other premises, other structures and grounds used by you as a residence;

   c. any premises used by you in connection with a premises in 4a or 4b above;

   d. any part of a premises:

      (1) not owned by an insured; and

      (2) where an insured is temporarily residing;

   e. vacant land, other than farm land, owned by or rented to an insured;

   f. land owned by or rented to an insured on which a one or two family dwelling is being built as a residence for an insured;

   g. individual or family cemetery plots or burial vaults of an insured; or

   h. any part of a premises occasionally rented to an insured for other than business use.

5. "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. bodily injury; or

   b. property damage.

6. "property damage" means physical damage to, or destruction of tangible property, including loss of use of this property.

7. "residence employee" means:

   a. an employee of an insured whose duties are related to the maintenance or use of the residence premises, including household or domestic services; or

   b. one who performs similar duties elsewhere not related to the business of an insured.

8. "residence premises" means:

   a. the one family dwelling, other structures, and grounds; or

   b. that part of any other building;

   where you reside and which is shown as the "residence premises" in the Declarations.

   "Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

Includes copyright material of Insurance Office, with its permission.

USAA77 00213

# SECTION I – PROPERTY COVERAGES

## COVERAGE A - Dwelling

We cover:

1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling;

2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**; and

3. permanently installed carpeting.

Except as specifically provided in SECTION I – ADDITIONAL COVERAGES, Land, we do not cover land, including land on which the dwelling is located.

## COVERAGE B - Other Structures

We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

Except as specifically provided in SECTION I – ADDITIONAL COVERAGES, Land, we do not cover land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for **business**; or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

## COVERAGE C - Personal Property

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured**;

2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually located at an **insured's** residence, other than the

**residence premises**, is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater.

Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This limit includes the cost to research, replace or restore the information from the lost or damaged material. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

3. $1,000 on watercraft, including their trailers, furnishings, equipment and outboard motors.

4. $1,000 on trailers not used with watercraft.

5. $1,000 for loss by theft of jewelry, watches, precious and semi-precious stones, fur garments, including any garment containing fur which represents its principal value.

6. $2,000 for loss by theft of firearms.

7. $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

8. (a) $2,500 for **business** property at your residence.

   (b) $250 for **business** property away from your residence.

9. $3,000 on motorized golf carts and their equipment and accessories. But if, at the time of loss, there is an automobile policy covering physical loss to golf carts, then this policy does not apply to those golf carts and their equipment and accessories.

Includes copyright material of Insurance Services Office, with its permission.

USAA77 00214

**Property Not Covered.** We do not cover:

1. articles separately described and specifically insured in this or other insurance;

2. animals, birds or fish;

3. motor vehicles or all other motorized land conveyances. This includes:

   a. equipment and accessories; or

   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

      (1) accessories or antennas; or

      (2) tapes, wires, records, discs or other media for use with any such device or instrument.

   while in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. used to service an insured's residence; or

   b. designed for assisting the handicapped.

   We also cover motorized golf carts and their equipment and accessories, subject to the provisions under Special Limits of Liability.

4. aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders, tenants, or other residents, not related to an insured;

6. property in an apartment regularly rented or held for rental to others by an insured, except as provided in ADDITIONAL COVERAGES, Landlord's Furnishings;

7. property rented or held for rental to others off the residence premises;

8. business data, including such data stored in:

   a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media.

   However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market.

9. credit cards or fund transfer cards except as provided in ADDITIONAL COVERAGES, Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.

**COVERAGE D - Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. **Additional Living Expense.** If a loss covered under Section − I makes that part of the residence premises where you reside not fit to live in, we cover the necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

   Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere, in either event, not to exceed 12 months.

2. **Fair Rental Value.** If a loss covered under Section − I makes that part of the residence premises rented to others or held for rental by you not fit to live in, we cover the fair rental value of that part of the residence premises rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental, but not to exceed 12 months.

3. **Prohibited Use.** If a civil authority prohibits you from use of the residence premises as a result of direct damage to neighboring premises by a loss covered under Section − I, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for not more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

No deductible applies to this coverage.

**ADDITIONAL COVERAGES**

1. **Debris Removal.**

   a. We will pay your reasonable expense for the removal of:

      1. debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

      2. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

Includes copyright material of Insurance Services Office, with its permission.

This expense is included in the limit of liability that applies to the damaged property. When the amount payable for the actual damage to the property plus the expense for debris removal exceeds the limit of liability for the damaged property, an additional 5% of that limit of liability will be available to cover debris removal expense.

b. We will also pay your reasonable expense, up to $500 in the aggregate, for the removal from the **residence premises** of:

1. your tree(s) felled by the peril of Windstorm or hail;

2. your tree(s) felled by the peril of Weight of ice, snow or sleet; or

3. a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.

2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a. does not increase the limit of liability that applies to the covered property;

b. does not relieve you of your duties, in case of a loss to covered property, as set forth in SECTION I – CONDITIONS  2.d.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be available for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay

up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance.    No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not increase the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $1,000 in the aggregate for:

a. the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b. loss resulting from theft or unauthorized use of fund transfer cards used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c. loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; or

d. loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover forgery, theft or use of a credit card or fund transfer card:

a. by a resident of your household;

b. by a person who has been entrusted with either type of card; or

c. if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured**.

This coverage is additional insurance.    No deductible applies to this coverage.

Includes copyright material of Insurance Services Office, with its permission.

USAA77 00216

**Defense:**

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an insured for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an insured or an insured's bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A – Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the residence premises.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under SECTIONS I and II – CONDITIONS, does not apply to Loss Assessment.

8. **Collapse.** As used in this section, collapse means a sudden falling or caving in of any part of a building, or a breaking apart or deformation of a building in such a way as to render it structurally unsound. Damage consisting of settling, cracking, shrinking, bulging or expansion is not included unless it occurs as a direct result of collapse.

We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in Coverage C – Personal Property. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

b. hidden decay within the insured structure;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals or people;

e. weight of rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building.

This coverage does not increase the limit of liability that applies to the damaged covered property.

9. **Lock Replacement.** When the dwelling door keys are stolen in a covered theft loss, we will pay the cost to:

a. change the combination in the lock cylinder of the door locks as needed; or

b. change the lock hardware of the doors as needed.

The limit of liability for Lock Replacement is $250. No deductible applies to this coverage.

10. **Refrigerated Products.** We will pay you up to $500 for loss to the contents of a freezer or a refrigerator located on the residence premises, as a consequence of power failure or mechanical breakdown.

This coverage does not increase the Coverage C limit of liability. No deductible applies to this coverage. The Power Failure exclusion under SECTION I – EXCLUSIONS, does not apply to Refrigerated Products.

11. **Land.** If a Peril Insured Against damages the building insured under Coverages A or B and the same Peril Insured Against causes the land necessary to support the building insured under Coverages A or B to become unstable, we will pay up to $10,000 for the cost required to replace, rebuild, stabilize or otherwise restore such land.

This is an additional amount of insurance.

12. **Glass or Safety Glazing Material.**

We cover:

a. the breakage of glass or safety glazing material by a Peril Insured Against which is part of a covered building, storm door or storm window; and

b. damage to covered property by glass or safety glazing material which is part of a building, storm door or storm window.

Includes copyright material of Insurance Services Office, with its permission.

This coverage does not include loss on the residence premises if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

This coverage does not increase the limit of liability that applies to the damaged property.

13. **Landlord's Furnishings.** We will pay up to $2500 for your appliances, your carpeting and other household furnishings, located in an apartment on the residence premises regularly rented or held for rental to others by an insured, for loss caused by the Perils Insured Against in Coverage C – Personal Property, except Theft.

The $2500 limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishing involved in the loss.

14. **Building Ordinance or Law.** For loss caused by

a Peril Insured Against to buildings under Coverage A or B, we will pay the increased costs which are required and you actually incur to rebuild, repair or demolish this property due to compliance with any ordinance or law in effect at the time of the loss.

The limit of liability for this coverage will not be more than 5% of the Coverage A limit of liability.

This coverage is additional insurance.

15. **Temporary Living Expense.** We will pay up to $2,000 for necessary increase in costs which you incur to maintain your normal standard of living when the residence premises is uninhabitable due to a loss caused by earthquake, volcanic eruption, landslide, or if a civil authority prohibits your use of the residence premises because an earthquake, volcanic eruption or landslide has occurred.

This coverage is additional insurance. No deductible applies to this coverage.

## SECTION 1 – PERILS INSURED AGAINST

**COVERAGE A - DWELLING and**

**COVERAGE B - OTHER STRUCTURES**

We insure against risks of direct, physical loss to property described in Coverages A and B; however, we do not insure loss:

1. involving collapse, other than as provided in ADDITIONAL COVERAGES, Collapse.

2. caused by:
   a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed and then, only if you have failed to:
      (1) maintain heat in the building; or
      (2) shut off the water supply and drain the system and appliances of water;
   b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:
      (1) fence, pavement, patio or swimming pool;
      (2) foundation, retaining wall or bulkhead; or
      (3) pier, wharf or dock;
   c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

   d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;
   e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

3. caused by or consisting of:
   a. wear and tear, marring, deterioration;
   b. inherent vice, latent defect, mechanical breakdown;
   c. smog, rust, or other corrosion, mold, wet or dry rot;
   d. smoke from agricultural smudging or industrial operations;
   e. discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

      Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

Includes copyright material of Insurance Services Office, with its permission.

f. settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

g. birds, vermin, rodents, insects; or

h. animals owned or kept by an insured.

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

4. excluded under SECTION I – EXCLUSIONS.

Under items 2 and 3, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## COVERAGE C - PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I – EXCLUSIONS.

1. Fire or lightning.

2. Windstorm or hail.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft and their trailers, furnishings, equipment and outboard motors, only while inside a fully enclosed building.

3. Explosion.

4. Riot or civil commotion.

5. Aircraft, including self-propelled missiles and spacecraft.

6. Vehicles.

7. Smoke, meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. Vandalism or malicious mischief.

9. Theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

This peril does not include loss caused by theft:

a. committed by an insured;

b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

c. from that part of a residence premises rented by an insured to other than an insured.

This peril does not include loss caused by theft that occurs off the residence premises of:

a. property while at any other residence owned by, rented to, or occupied by an insured, except while an insured is temporarily residing there. Property of a student who is an insured is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. watercraft, including their furnishings, equipment and outboard motors; or

c. trailers and campers.

10. Falling objects.

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. Weight of ice, snow or sleet which causes damage to property contained in a building.

12. Accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. In this peril, a plumbing system does not include a sump pump, sump well or similar device designed to drain water from the foundation area.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing except as provided in the peril of Freezing below; or

c. on the residence premises caused by accidental discharge or overflow which occurs off the residence premises.

Includes copyright material of Insurance Services Office, with its permission.

USAA77 00219

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

This peril does not include loss caused by or resulting from freezing.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the residence premises while the dwelling is unoccupied, if you have failed to:

a. maintain heat in the building; or

b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

16. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, other than as provided in ADDITIONAL COVERAGES, Building Ordinance or Law.

   b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:

      (1) fire;

      (2) explosion; or

      (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;

      ensues and then we will pay only for the ensuing loss.

      This exclusion does not apply to loss by theft.

   c. **Water Damage,** meaning:

      (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

      (2) water which backs up through sewers or drains or which overflows from a sump pump, sump well or similar device designed to drain water from the foundation area; or

      (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   Direct loss by fire, explosion or theft resulting from water damage is covered.

   d. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the residence premises, except as provided in ADDITIONAL COVERAGES, Refrigerated Products. But if a Peril Insured Against ensues on the residence premises, we will pay only for that ensuing loss.

   e. **Neglect,** meaning neglect of the insured to use all reasonable means to save and preserve property at and after the time of a loss.

   f. **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

   g. **Nuclear Hazard,** meaning any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

   h. **Intentional Loss,** meaning any loss arising out of any act committed:

      (1) by or at the direction of any insured; and

      (2) with the intent to cause a loss.

Includes copyright material of Insurance Services Office, with its permission.

2. We do not insure against loss consisting of any of the following. Nor do we insure for loss that results when one or more of the following combines with other causes, events or conditions that are also excluded or excepted in this policy. However, any loss that ensues from the following, that is not otherwise excluded or excepted is covered.

   a. **Weather Conditions.**

   b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body.

c. **Faulty, negligent, inadequate or defective:**

   (1) planning, zoning, development, surveying, siting;

   (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   (3) materials used in repair, construction, renovation or remodeling; or

   (4) maintenance;

   of part or all of any property whether on or off the residence premises.

## SECTION I – CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the insured for more than the amount of the insured's interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to which this insurance may apply, you must see that the following are done:

   a. give prompt notice to us or our agent;

   b. notify the police in case of loss by theft;

   c. notify the credit card or fund transfer card company in case of loss under ADDITIONAL COVERAGES, Credit Card or Fund Transfer Card coverage;

   d. (1) protect the property from further damage;

      (2) make reasonable and necessary repairs to protect the property; and

      (3) keep an accurate record of repair expenses;

   e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   f. as often as we reasonably require:

      (1) show the damaged property;

      (2) provide us with records and documents we request and permit us to make copies; and

      (3) submit to examinations under oath, while not in the presence of any other insured, and sign the same;

      (4) assure the attendance of employees, members of your household or others for examinations under oath to the extent it is within your power to do so.

g. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   (1) the time and cause of loss;

   (2) the interest of the insured and all others in the property involved and all liens on the property;

   (3) other insurance which may cover the loss;

   (4) changes in title or occupancy of the property during the term of the policy;

   (5) specifications of damaged buildings and detailed repair estimates;

   (6) the inventory of damaged personal property described in 2e above;

   (7) receipts for Additional Living Expenses and Temporary Living Expenses incurred and records that support the Fair Rental Value loss; and

   (8) evidence or affidavit that supports a claim under ADDITIONAL COVERAGES, Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) personal property;

      (2) awnings, household appliances, outdoor antennas, and outdoor equipment, whether or not attached to buildings; and

      (3) structures that are not buildings.

      It is our option to:

      (a) pay you the actual cash value; or

      (b) replace or to pay you our cost to replace the property with property of like kind, quality, age and condition; or

Includes copyright material of Insurance Services Office, with its permission.

(c) pay you the cost to repair or restore the property to the condition it was in just before the loss.

We will not pay more than the limit of liability shown on the Declarations Page for Coverage C, nor more than any other limits stated in the policy.

b. All items under Coverage A – Dwelling and buildings under Coverage B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) the limit of liability under this policy that applies to the building;

(b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) the necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) the actual cash value of that part of the building damaged; or

(b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage unless:

(a) actual repair or replacement is complete; or

(b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than $2,500.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for physical loss to buildings on an actual cash value basis. You may then make claims within 180 days after loss for any additional liability on a replacement cost basis.

4. Loss to a Pair or Set. In case of loss to a pair or set we may elect to:

a. repair or replace any part to restore the pair or set to its value before the loss; or

b. pay the difference between actual cash value of the property before and after the loss.

5. Appraisal. If you and we do not agree on the amount of loss, either party can demand that the amount of the loss be determined by appraisal. If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand.

The two appraisers will then select a competent, impartial umpire. If the two appraisers are not able to agree upon the umpire within 15 days, you and we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.

The appraisers will then set the amount of loss. If they submit a written report of any agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will set the amount of the loss. Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be equally paid by you and us.

Includes copyright material of Insurance Services Office, with its permission.

6. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

This policy does not apply to motorized golf carts and their equipment and accessories when an automobile policy also applies.

7. **Suit Against Us.** No action can be brought against us unless you have:

   a. given us notice of the loss,

   b. complied with all other policy provisions, and

   c. started the action

   within one year after the date of the loss.

8. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

9. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

   a. reach an agreement with you;

   b. there is an entry of a final judgment; or

   c. there is a filing of an appraisal award with us.

10. **Abandonment.** You may not abandon property to us for any reason.

11. **Mortgage Clause.** The word "mortgagee" includes trustee.

   If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

   If we deny your claim, that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:

   a. promptly notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   b. pays any premium due under this policy on demand if you have neglected to pay the premium; and

   c. sends to us, within 60 days after our request, a signed sworn proof of loss which sets forth, to the best of the mortgagee's knowledge and belief:

   (1) the time and cause of loss;

   (2) the interest of the mortgagee and all others in the property involved and all liens on the property;

   (3) other insurance which may cover the loss;

   (4) changes in title or occupancy of the property during the term of the policy;

   (5) specifications of damaged buildings and detailed repair estimates.

   Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

   d. submits to examinations under oath.

   If we decide to cancel or not to renew this policy, the mortgagee will be properly notified at least 10 days before the date cancellation or nonrenewal takes effect.

   If we pay the mortgagee for any loss and deny payment to you:

   a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

   b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

   Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

12. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

13. **Salvage and Recovered Property.**

   a. We have an interest in the salvage value of any property for which we have made a payment under the Loss Settlement provision. At our option, property that we have paid for or replaced becomes our property.

   b. If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At our option, the property may be retained by you. If you retain the property, the loss payment, or any lesser amount to which we agree, must be refunded to us.

Includes copyright material of Insurance Services Office, with its permission.

14. **Concealment or Fraud.** With respect to all insureds, the entire policy will be void if whether before or after a loss any insured has:

  a. intentionally concealed or misrepresented any material fact or circumstance;

  b. engaged in fraudulent conduct; or

  c. made false statements;

  relating to this insurance.

15. **Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

## SECTION II – LIABILITY COVERAGES

**COVERAGE E - Personal Liability**

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the insured is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

**COVERAGE F - Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing bodily injury. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except residence employees. As to others, this coverage applies only:

1. to a person on the insured location with the permission of an insured; or

2. to a person off the insured location, if the bodily injury:

  a. arises out of a condition on the insured location or the ways immediately adjoining;

  b. is caused by the activities of an insured;

  c. is caused by a residence employee in the course of the residence employee's employment by an insured; or

  d. is caused by an animal owned by or in the care of an insured.

## SECTION II – EXCLUSIONS

1. **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** do not apply to bodily injury or property damage:

  a. caused by the intentional or purposeful acts of any insured, including conduct that would reasonably be expected to result in bodily injury to any person or property damage to any property.

  b. (1) arising out of or in connection with a business engaged in by an insured. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the business;

    (2) arising out of the rental or holding for rental of any part of any premises by an insured. This exclusion does not apply to the rental or holding for rental of an

insured location:

    (i) on an occasional basis if used only as a residence;

    (ii) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

    (iii) in part, as an office, school, studio or private garage;

  c. arising out of the rendering of or failure to render professional services;

  d. arising out of a premises:

    (1) owned by an insured;

    (2) rented to an insured; or

    (3) rented to others by an insured;

    that is not an insured location;

Includes copyright material of Insurance Services Office, with its permission.

HO-3R  (04-93)

USAA77 00224

e.  arising out of:

(1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an insured;

(2) the entrustment by an insured of a motor vehicle or any other motorized land conveyance to any person; or

(3) vicarious liability, whether or not statutorily imposed, for the actions of anyone using a conveyance excluded in paragraph (1) or (2) above.

This exclusion does not apply to:

(1) a trailer not towed by or carried on a motorized land conveyance;

(2) a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

(a) not owned by an insured; or

(b) owned by an insured and on an insured location;

(3) a motorized golf cart when used to play golf on a golf course;

(4) a vehicle or conveyance not subject to motor vehicle registration which is:

(a) used to service an insured's residence;

(b) designed for assisting the handicapped; or

(c) in dead storage on an insured location;

f.  arising out of:

(1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

(2) the entrustment by an insured of a watercraft described below to any person; or

(3) vicarious liability, whether or not statutorily imposed, for the actions of anyone using a watercraft described below.

Watercraft:

(1) with inboard or inboard-outdrive motor power of more than 50 horsepower owned by or rented to an insured;

(2) that is a sailing vessel, with or without auxiliary power, which is more than 35

feet in length owned by or rented to an insured;

(3) powered by one or more outboard motors with more than 50 total horsepower if the outboard motor is owned by the insured. If acquired during the policy period, outboard motors of more than 50 total horsepower are covered for that policy period only; or

(4) that uses a water jet pump powered by an internal combustion engine as the primary source of propulsion owned by an insured.

This exclusion does not apply while the watercraft is stored.

g.  arising out of:

(1) the ownership, maintenance, use, loading or unloading of an aircraft;

(2) the entrustment by an insured of an aircraft to any person; or

(3) vicarious liability, whether or not statutorily imposed, for the actions of anyone using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

h.  caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

i.  which arises out of the transmission of a communicable disease by an insured.

j.  arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a controlled substance(s). Controlled substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions d., e., f. and g. do not apply to bodily injury to a residence employee arising out of and in the course of the residence employee's employment by an insured.

Includes copyright material of Insurance Services Office, with its permission.

USAA77 00225

2. **Coverage E - Personal Liability** does not apply to:

a. liability:

   (1) for any loss assessment charged against you as a member of an association, corporation or community of property owners;

   (2) under any contract or agreement. However, this exclusion does not apply to written contracts:

     (a) that directly relate to the ownership, maintenance or use of an **insured location**; or

     (b) where the liability of others is assumed by the **insured** prior to an **occurrence**;

   unless excluded in (1) above or elsewhere in this policy;

b. **property damage** to property owned by the **insured**;

c. **property damage** to property rented to, occupied or used by or in the care of the **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to any person eligible to receive any benefits:

   (1) voluntarily provided; or

   (2) required to be provided;

   by the **insured** under any:

   (1) workers' compensation law;

   (2) non-occupational disability law; or

   (3) occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy:

   (1) is also an insured under a nuclear energy liability policy; or

   (2) would be an insured under that policy

but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

   (1) American Nuclear Insurers;

   (2) Mutual Atomic Energy Liability Underwriters;

   (3) Nuclear Insurance Association of Canada;

   or any of their successors;

f. **bodily injury** to you or an **insured** within the meaning of part a. or b. of "Insured" as defined.

3. **Coverage F - Medical Payments to Others** does not apply to **bodily injury**:

a. to a **residence employee** if the **bodily injury**:

   (1) occurs off the **insured location**; and

   (2) does not arise out of or in the course of the **residence employee's** employment by an **insured**;

b. to any person eligible to receive benefits:

   (1) voluntarily provided; or

   (2) required to be provided;

   under any:

   (1) workers' compensation law;

   (2) non-occupational disability law; or

   (3) occupational disease law;

c. from any:

   (1) nuclear reaction;

   (2) nuclear radiation; or

   (3) radioactive contamination;

   all whether controlled or uncontrolled or however caused; or

   (4) any consequence of any of these;

d. to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

   a. expenses we incur and costs taxed against an **insured** in any suit we defend;

   b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

   c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $100 per day, for assisting us in the investigation or defense of a claim or suit;

   d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies;

Includes copyright material of Insurance Services Office, with its permission.

e.  prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of liability, we will not pay any prejudgment interest based on that period of time after the offer.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.** We will pay, at replacement cost, up to $1,000 per occurrence for **property damage** to property of others caused by an **insured**.

   We will not pay for **property damage**:

   a.  to the extent of any amount recoverable under SECTION I of this policy;

   b.  caused intentionally by an **insured** who is 13 years of age or older;

   c.  to property owned by an **insured**;

   d.  to property owned by or rented to a tenant of an **insured** or a resident in your household; or

   e.  arising out of:

       (1)  a business engaged in by an **insured**;

       (2)  any act or omission in connection with a premises owned, rented or controlled by an **insured**, other than the **insured location**; or

       (3)  the ownership, maintenance or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

           This exclusion does not apply to any motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **insured**.

4. **Loss Assessment.** We will pay up to $1,000

for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

a.  **bodily injury** or **property damage** not excluded under SECTION II of this policy; or

b.  liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

    (1)  the director, officer or trustee is elected by the members of a corporation or association of property owners; and

    (2)  the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

a.  one accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

b.  a covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1.  SECTION II, Coverage E – Personal Liability Exclusion 2.a.(1);

2.  Condition 1. Policy Period, under SECTIONS I and II – CONDITIONS.

## SECTION II – CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one

**occurrence**.

Our total liability under Coverage F for all medical expenses payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition will not increase our limit of liability for any one **occurrence**.

Includes copyright material of Insurance Services Office, with its permission.

3. **Concealment or Fraud.** We do not provide coverage to any **insured** who, whether before or after a loss, has:

   a. intentionally concealed or misrepresented any material fact or circumstance;

   b. engaged in fraudulent conduct; or

   c. made false statements;

   relating to this insurance.

4. **Duties After Loss.** In case of an accident or occurrence, the **insured** will perform the following duties that apply. You will help us by seeing that these duties are performed:

   a. give written notice to us or our agent as soon as is practical, which sets forth:

      (1) the identity of the policy and **insured**;

      (2) reasonably available information on the time, place and circumstances of the accident or occurrence; and

      (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or occurrence;

   c. at our request, help us:

      (1) to make settlement;

      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**;

      (3) with the conduct of suits and attend hearings and trials;

      (4) to secure and give evidence and obtain the attendance of witnesses;

   d. under Damage to Property of Others, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the **insured's** control;

   e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury.**

5. **Duties of an Injured Person – Coverage F – Medical Payments to Others.** The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

6. **Payment of Claim – Coverage F – Medical Payments to Others.** Payment under this coverage is not an admission of liability by an **insured** or us.

7. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

   No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

8. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

9. **Other Insurance – Coverage E – Personal Liability.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

---

## SECTIONS I AND II – CONDITIONS

1. **Policy Period.** This policy applies only to loss in SECTION I or **bodily injury** or **property damage** in SECTION II, which occurs during the policy period.

2. **Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

   This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

Includes copyright material of Insurance Services Office, with its permission.

HO-3R (04-93)

USAA77 00228

3. **Waiver or Change of Policy Provisions.** A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

4. **Cancellation.**

   a. You may cancel this policy at any time. But the effective date of cancellation cannot be earlier than the date of your request.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (b) If the risk has changed substantially since the policy was issued.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

   c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

   d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

5. **Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

6. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

7. **Subrogation.** An insured may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, an insured must sign and deliver all related papers and cooperate with us.

   Subrogation does not apply under SECTION II to Medical Payments to Others or Damage to Property of Others.

8. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. insured includes:

   (1) any member of your household who is an insured at the time of your death, but only while a resident of the residence premises; and

   (2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Includes copyright material of Insurance Services Office, with its permission.

HO-3R  (04-93)

USAA77 00229

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPOUSE ACCESS

The following condition is added:

The named insured and we agree that the named insured and resident spouse are "customers" for purposes of state and federal privacy laws. The resident spouse will have access to the same information available to the named insured and may initiate the same transactions as the named insured.

The named insured may notify us that he/she no longer agrees that the resident spouse shall be treated as a "customer" for purposes of state and federal privacy laws, and we will not permit the resident spouse to access policy information.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Copyright, USAA, 2005. All rights reserved.

ESA (02-05)

49319-0205

USAA77 00230

HO-IDF (07-01)

THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY

### IDENTITY AND FINANCIAL FRAUD COVERAGE

Under Section I., Additional Coverages, Item 6. Is deleted and replaced by the following:

**6. Credit Card, Fund Transfer Card, Forgery, Counterfeit Money, and Identity Fraud Expense Coverage**

We will pay up to $5,000 in the aggregate for all loss and defense costs resulting from:

a. the legal obligation of any **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in any **insured's** name;

b. loss resulting from theft or unauthorized use of electronic fund transfer cards or access devices used for deposit, withdrawal or transfer of funds, issued to or registered in any **insured's** name;

c. loss to any **insured** caused by forgery or alteration of any check or negotiable instrument;

d. loss to any **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency; or

e. **expenses** incurred by any **insured** as the direct result of any one **Identity Fraud.**

For the purposes of this endorsement a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss, even if a series of acts continues into a subsequent policy period.

We will provide defense, other than that provided by Identity Fraud Expense coverage as follows:

a. we may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay or tender for the loss equals our limit of liability.

b. if a suit is brought against any **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. we have the option to defend at our expense any **insured** or any **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

### DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1. **"Expenses"** means:

a. costs for notarizing fraud affidavits or similar documents for financial institutions or similar credit grantors or credit agencies that have required that such affidavits be notarized;

b. costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

c. lost wages as a result of time taken off from work to meet with, or talk to, law enforcement agencies, credit agencies, merchants, and/or legal counsel, or to complete fraud affidavits, not to exceed $250 per day;

d. loan application fees for re-applying for a loan or loans when original application is rejected solely because the lender received incorrect credit information;

e. reasonable attorney fees incurred, with our prior consent, for:

(1) defense of lawsuits brought against an **insured** by merchants or their collection agencies; and

(2) the removal of any criminal or civil judgments wrongly entered against an **insured;**

f. charges incurred for long distance telephone calls to merchants, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss **Identity Fraud;**

g. research fees charged by merchants, financial institutions or similar credit grantors, or credit agencies.

HO-IDF (07-01)

Page 1 of 2

USAA77 00231

2. **"Identity Fraud"** means the act of knowingly transferring or using, without lawful authority, a means of identification of any **insured** with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

## EXCLUSIONS

The following additional exclusions apply to this coverage.

1. We do not cover forgery, theft or use of a credit card, electronic fund transfer card or access device:

    a. by a resident of your household;

    b. by a person who has been entrusted with the card(s) or device(s); or

    c. if any **insured** has not complied with all terms and conditions under which the cards or devices are issued.

2. We do not cover loss arising out of **business** pursuits, dishonesty, fraud, or criminal activity of any **insured.**

This coverage is additional insurance. A $100 deductible applies to the Identity Fraud Expense coverage. No deductible applies to the Credit Card, Fund Transfer Card, Forgery, and Counterfeit Money coverage.

## YOUR DUTIES AFTER LOSS

The following is added under SECTION I - CONDITIONS. Item 2. Your Duties After Loss:

    h. provide us with receipts, bills or other records that support your claim for expenses under **Identity Fraud** expense coverage.

## OTHER INSURANCE

For the purposes of this endorsement, Item 6. Other Insurance under SECTION I - CONDITIONS is deleted and replaced by the following:

The coverage provided by this endorsement is excess over other insurance that covers the same loss. Other insurance includes the coverage and any deductible required by such other insurance. This coverage is also excess over any other contractual conditions, rights or benefits that provide relief from or indemnification for your obligations to pay any amounts to any third party resulting from a loss covered under this endorsement. In no event will we pay more than the applicable Limit of Insurance.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Copyright, USAA 2001. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

USAA77 00232


HO-MS
(06-99)

## SECTION I - PROPERTY COVERAGES

For Form HO-6R only, COVERAGE D - Loss of Use, Item 1. **Additional Living Expense** is deleted and replaced by the following:

1. **Additional Living Expense.** If a loss covered under Section I to covered property or the building containing the property, makes the **residence premises** where you reside not fit to live in, we cover the necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

   Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere, in either event not to exceed 12 months.

ADDITIONAL COVERAGES 7. Loss Assessment is deleted and replaced by the following:

7. **Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A - Dwelling, subject to all provisions of the policy. Assessments made as a result of damage caused by earthquake or land shock waves or tremors before, during or after a volcanic eruption are not covered.

   This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

   We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

   The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

   Condition 1. Policy Period, under SECTIONS I AND II - CONDITIONS, does not apply to Loss Assessment.

8. **Collapse** is deleted and replaced with:

8. **Collapse.** For an entire building or any part of a building, collapse means:

   a. a sudden falling or caving in;

   b. a sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use.

   Damage consisting of settling, cracking, shrinking, bulging or expansion is not included unless it occurs as a direct result of collapse.

   We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

   a. Perils Insured Against in Coverage C - Personal Property. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

   b. decay that is hidden from view, meaning damage that is unknown prior to collapse or that does not result from a failure to reasonably maintain the property;

   c. insect or vermin damage that is hidden from view, meaning damage that is unknown prior to collapse or that does not result from a failure to reasonably maintain the property;

   d. weight of contents, equipment, animals or people;

   e. weight of rain which collects on a roof; or

   f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building or any part of a building.

   This coverage does not increase the limit of liability that applies to the damaged covered property.

USAA77 00234

## SECTION I - LOSS SETTLEMENT

The following applies only to Form HO-9R:

**5. Loss Settlement – Personal Property** is deleted and replaced by the following:

**5. Loss Settlement – Personal Property.** Losses to covered property will be settled at full replacement cost without deduction for depreciation subject to the following:

### REPLACEMENT COST COVERAGE DEFINED

As regards personal property, Replacement Cost means the cost, at the time of loss, of a new item identical to the one damaged, destroyed or stolen. If an identical item is no longer manufactured or cannot be obtained, replacement cost will be the cost of a new item which is:

similar to the insured article, and

of like quality and usefulness.

### PROPERTY NOT ELIGIBLE

Replacement cost coverage does not apply to:

Items of rarity or antiquity that cannot be replaced;

articles whose age or history contributes substantially to their value. These include, but are not limited to, memorabilia, souvenirs and collectors' items;

motorized golf carts and their equipment and accessories;

articles not maintained in good or workable condition;

property that is either obsolete or useless to the insured at the time of loss;

property that is not repaired, replaced, or restored, unless the entire loss is less than $500.

a. For property eligible for Replacement Coverage it is our option to:

(1) replace, or pay you our cost to replace the property with new property of like kind and quality without deduction for depreciation, or

(2) pay you the cost to repair or restore the property to the condition it was in just before the loss, or

(3) pay you the necessary amount actually spent to repair or replace the damaged property.

b. We will pay no more than actual cash value until repair or replacement of the damaged property is completed, unless the entire loss is less than $500.

c. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability under the terms of this endorsement.

d. For property that is not eligible for replacement cost coverage, it is our option to:

(1) pay you the actual cash value; or

(2) replace, or to pay you our cost to replace the property with property of like kind, age, quality and condition; or

(3) pay you the cost to repair or restore the property to the condition it was in just before the loss.

e. We will not pay more than the Limit of Liability that applies to Coverage C. Nor will we pay more than any Special Limits of Liability that apply as stated in this policy.

## SECTION I - CONDITIONS

**11. Mortgage Clause.** This clause is amended as follows:

The sentence "If we decide to cancel or not renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect." is deleted and replaced by the following:

If we decide to cancel or not to renew this policy, the mortgagee will be notified:

a. At least 30 days before the date cancellation takes effect; or

b. At least 10 days before the date nonrenewal takes effect.

HO-MS (06-99)

USAA77 00235

## SECTION II - LIABILITY COVERAGES

**Coverage E - Personal Liability** is deleted and replaced by the following:

If a claim is made or a suit is brought against an **insured** for compensatory damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the insured is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay or tender for damages resulting from the **occurrence** equals our limit of liability. This coverage does not provide defense to any **insured** for criminal prosecution or proceedings.

## SECTION II - LIABILITY EXCLUSIONS

Under Item **1. Coverage E - Personal Liability and Coverage F - Medical Payments to Others** item **1.f,** watercraft (4) is deleted and replaced by the following:

(4) that is a personal watercraft. As used in this section, personal watercraft means a conveyance used or designed to be used on the water which is propelled by a water jet propulsion pump.

The following exclusions are added to Item **1. Coverage E - Personal Liability and Coverage F - Medical Payments to Others:**

1. arising out of the actual, alleged, or threatened discharge, dispersal, release, escape, seepage or migration of pollutants however caused and whenever occurring. This includes any loss, cost or expense arising out of any:

   a. Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or assess the effects of pollutants; or

   b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

2. arising out of exposure to lead paint or other lead-based products.

3. arising out of exposure to asbestos.

4. arising out of the commission of, attempting to flee from, or avoiding apprehension for a criminal act for which intent is a necessary element.

## SECTIONS I AND II - CONDITIONS

4. **Cancellation.** Paragraph **b.(2)** is deleted and replaced by the following:

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 30 days before the date cancellation takes effect.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Copyright, USAA, 1999. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

USAA77 00236

HO-17 (07-00)

## ADJUSTED BUILDING COST ENDORSEMENT

It is agreed that the limit for SECTION I, Coverage A – Dwelling, shown in the Declarations of this policy, will be revised at each policy renewal to reflect the rate of change in the replacement cost of your dwelling. The resulting limit will be rounded to the next $1000.

SECTION I, Coverages B (Other Structures), C (Personal Property) and D (Loss of Use) will also be adjusted. The rules then in use by us will determine the new limits for these coverages.

These limits will not be reduced without your consent.

You have the right to refuse any resulting change in limits. You must do so in writing before the effective date of such change. If you do reject the new limits, we will delete this endorsement from your policy.

We have the right to change to another replacement cost calculation tool as of any renewal date. We will give you at least 30 days prior written notice if we do this. Such change must apply to all similar policies issued by us.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Copyright, USAA, 2000. All rights reserved.

HO-17 (07-00)

USAA77 00237

FIRE/BURGLARY PROTECTION CREDIT          HO-216 (04-93)

For a premium credit, we acknowledge the installation of an alarm system, smoke detector or automatic sprinkler system approved by us on the residence premises. You agree to maintain this system in working order and to notify us promptly of any change made to the system or if it is removed.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

| System | Type |
|---|---|
| FIRE/SMOKE | LOCAL |

Total Policy Credit          $39.21

ALARM TYPES

Local:    System sounds at the residence only.

Remote:  System with a direct line to a police or fire system.

Central:  System with a direct connection to a central, commercial location where the alarm is constantly monitored.

Copyright, USAA, 1993. All rights reserved.
Includes copyright material of Insurance Services Office, Inc., with its permission.

HO-216 (04-93)

USAA77 00238

HO-125 (04-93)

**HOME PROTECTOR**
**(HO-3R only)**

For an additional premium, Section I — Conditions, Item 3.b. Loss Settlement is deleted and replaced by the following:

b. **Home Protector Coverage Loss Settlement – Buildings Covered Under Coverages A or B.** If you comply with the requirements of Item c., HOME PROTECTOR COVERAGE REQUIREMENTS, the Home Protector Loss Settlement applies.

For covered property losses to buildings, under Coverages A and B, and outdoor antennas and outdoor equipment, whether or not attached to buildings, we will pay the amount actually and necessarily spent to repair or replace the damaged building.

If, as a result of a covered loss,

(1) the limit of liability applying to buildings covered under Coverages A or B is exhausted;

(2) the limit of liability provided under ADDITIONAL COVERAGES, Debris Removal is exhausted;

(3) the limit of liability provided under ADDITIONAL COVERAGES, Building Ordinance or Law is exhausted;

then, we will pay up to an additional 25% of the limit of liability applying to the damaged building. The most we will pay for (1), (2), or (3), either singly or in any combination is 25%.

When the cost to repair or replace the damaged building is more than $2500, we will pay no more than the actual cash value of the damage until the repair or replacement is completed.

c. **Home Protector Coverage Requirements.** You agree:

(1) that you will insure your buildings under Coverages A and B for the full replacement cost at the time this policy is issued; and

(2) that each year you will accept any increase in coverage that results from the application of the Adjusted Building Cost endorsement if it is deemed necessary by us. You must pay for any added premium;

and

(3) that you will tell us within 90 days of the start of any additions or other physical changes to buildings on the residence premises which increase the value $5000 or more. You must pay any resulting premium.

If you fail to comply with these requirements, then, covered property losses will be settled as outlined in Item d., LOSS SETTLEMENT–BUILDINGS UNDER COVERAGES A AND B.

d. **Loss Settlement – Buildings Covered Under Coverages A and B.** If you fail to comply with the requirements listed in Item c., HOME PROTECTOR COVERAGE REQUIREMENTS, covered property losses will be settled at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after the application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

  (a) the limit of liability under this policy that applies to the damaged building;

  (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

  (c) the necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

  (a) the actual cash value of that part of the building damaged; or

HO-125 (04-93)

USAA77 00239

(b) that proportion of the cost to repair or replace, after application of the deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy in the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage unless:

(a) actual repair or replacement is complete; or

(b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than $2500.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for physical loss to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Term Premium          $196.03

Copyright, USAA, 1983. All rights reserved.

HO-125 (04-83)

USAA77 00240





USAA77 00241





USAA77 00242









## Repair/Replacement Cost Statement

USAA®

To comply with the Replacement Cost Coverage provisions of your policy, upon completion of repairs, please provide us with the following documentation: Receipts/bills from contractors or repair bills showing that repairs have been completed and indicating the amount paid for those repairs. This information must be provided to us within 180 days of the date of loss.

INSURED:              Keary Burger
POLICY NUMBER:   152-66-82
DATE OF LOSS:      8/29/05
LOCATION OF PROPERTY:      608 Lewis Ave, Long Beach, MS

TYPE OF PROPERTY INVOLVED IN CLAIM:          DWELLING

| | | |
|---|---|---|
| 1. | FULL AMOUNT OF INSURANCE applicable to the property for which claim is presented was ................................................ | **$164,000.00** |
| 2. | FULL REPLACEMENT COST of the said property at the time of the loss was ........................................................................ | **$0.00** |
| 3. | The FULL COST OF REPAIR or REPLACEMENT is ...................... | **$23,068.49** |
| 4. | APPLICABLE DEPRECIATION is ...................................................... | **$5,104.82** |
| 5. | ACTUAL CASH VALUE loss is (line 3 minus line 4) ...................... | **$17,963.67** |
| 6. | LESS DEDUCTIBLES AND/OR PARTICIPATION by the insured .. | **$1,640.00** |
| 7. | ACTUAL CASH VALUE CLAIM is (line 5 minus line 6) .................... | **$16,323.67** |
| 8. | SUPPLEMENTAL CLAIM, to be filed in accordance with the terms and conditions of the Replacement Cost Coverage and will not exceed ------------------------------------------------------------- | **$5,104.82** |

**The following items will not be considered in the Supplemental payment.**

1.      Increase in material and/or labor due to unnecessary or unreasonable delay.

2.      Contractors overhead and profit not incurred.

**In no event will the Actual Cash Value payment and the Supplemental payment exceed the amount actually and necessarily spent, less the deductible.**

FLORIDA Statutes, Section 817.234 states: "Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree"

_____

_____INSURED

STATE OF _____
COUNTY OF _____

Subscribed and sworn to before me this _____ day of _____ 19___

_____Notary Public

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

| | | | |
|---|---|---|---|
| Insured: | Burger, Keary | Cellular: | (228) 383-8729 |
| Property: | 608 Lewis Ave.<br>Long Beach, MS 39560-1606 | | |
| Claim Rep.: | Kevin Hromas | | |
| Estimator: | Kevin Hromas | | |
| Reference: | | | |
| Contractor: | | | |

| Claim Number | Policy Number | Type of Loss | Deductible |
|---|---|---|---|
| 152-66-82 (W) | 90A | Hurricane | $ 1,640.00 |

| | | | |
|---|---|---|---|
| Dates: | | | |
| Date Contacted: | 01/28/06 | | |
| Date of Loss: | 08/29/05 | Date Received: | 01/24/06 |
| Date Inspected: | 02/02/06 | Date Entered: | 02/06/06 |

| | |
|---|---|
| Price List: | MSGU3S53<br>Restoration/Service/Remodel with Service Charges<br>Factored In |

This is an estimate for the visible damages to your property. It is subject to review and acceptance by the carrier prior to payment of the claim. If there are damages that are revealed during the repair process, contact the carrier for a suuplemental claim.

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

2006-02-06-1511

Main Level

**Room: Living Room**

| | | |
|---|---|---|
| 432.67 SF Walls | 225.99 SF Ceiling | 658.65 SF Walls & Ceiling |
| 225.99 SF Floor | 25.11 SY Flooring | 54.08 LF Floor Perimeter |
| | | 54.08 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 225.99 SF | 0.41 | 92.65 | 0.00 | 92.65 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 225.99 SF | 5.26 | 1,188.69 | 297.18 | 891.51 |
| Seal then paint the ceiling (2 coats) | 225.99 SF | 0.56 | 126.55 | 63.28 | 63.27 |
| R&R Blown-in insulation - 6" depth - R19 | 225.99 SF | 0.88 | 198.86 | 99.44 | 99.42 |

| | | | | | |
|---|---|---|---|---|---|
| **Room Totals: Living Room** | | | **1,686.58** | **472.35** | **1,214.23** |

**Room: Dining Room**

| | | |
|---|---|---|
| 432.67 SF Walls | 225.99 SF Ceiling | 658.65 SF Walls & Ceiling |
| 225.99 SF Floor | 25.11 SY Flooring | 54.08 LF Floor Perimeter |
| | | 54.08 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 225.99 SF | 0.41 | 92.65 | 0.00 | 92.65 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 225.99 SF | 5.26 | 1,188.69 | 297.18 | 891.51 |
| Seal then paint the ceiling (2 coats) | 225.99 SF | 0.56 | 126.55 | 63.28 | 63.27 |
| R&R Blown-in insulation - 6" depth - R19 | 225.99 SF | 0.88 | 198.86 | 99.44 | 99.42 |

| | | | | | |
|---|---|---|---|---|---|
| **Room Totals: Dining Room** | | | **1,686.58** | **472.35** | **1,214.23** |

USAA77 00063

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**Room: Bedroom 1**

| | | | |
|---|---|---|---|
| 428.00 SF Walls | 176.25 SF Ceiling | 604.25 SF Walls & Ceiling | |
| 176.25 SF Floor | 19.58 SY Flooring | 53.50 LF Floor Perimeter | |
| | | 53.50 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 176.25 SF | 0.41 | 72.26 | 0.00 | 72.26 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 176.25 SF | 5.26 | 927.08 | 231.77 | 695.31 |
| Seal then paint the ceiling (2 coats) | 176.25 SF | 0.56 | 98.70 | 49.35 | 49.35 |
| R&R Blown-in insulation - 6" depth - R19 | 176.25 SF | 0.88 | 155.10 | 77.55 | 77.55 |

| Room Totals: Bedroom 1 | | | 1,332.97 | 371.12 | 961.85 |
|---|---|---|---|---|---|

**Room: BR 1 Clst**

| | | | |
|---|---|---|---|
| 112.00 SF Walls | 10.00 SF Ceiling | 122.00 SF Walls & Ceiling | |
| 10.00 SF Floor | 1.11 SY Flooring | 14.00 LF Floor Perimeter | |
| | | 14.00 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 10.00 SF | 0.41 | 4.10 | 0.00 | 4.10 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 10.00 SF | 5.26 | 52.60 | 13.15 | 39.45 |
| Seal then paint the ceiling (2 coats) | 10.00 SF | 0.56 | 5.60 | 2.80 | 2.80 |
| R&R Blown-in insulation - 6" depth - R19 | 10.00 SF | 0.88 | 8.80 | 4.40 | 4.40 |

2006-02-06-1511

USAA77 00064

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

CONTINUED - BR 1 Clst

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Room Totals: BR 1 Clst | | | 150.93 | 32.80 | 118.13 |

Room: Bedroom 2

| 446.67 SF Walls | 191.63 SF Ceiling | 638.29 SF Walls & Ceiling |
|---|---|---|
| 191.63 SF Floor | 21.29 SY Flooring | 55.83 LF Floor Perimeter |
| | | 55.83 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Room Totals: Bedroom 2 | | | 0.00 | 0.00 | 0.00 |

Room: BR 2 Clst

| 150.67 SF Walls | 12.40 SF Ceiling | 163.07 SF Walls & Ceiling |
|---|---|---|
| 12.40 SF Floor | 1.38 SY Flooring | 18.83 LF Floor Perimeter |
| | | 18.83 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Room Totals: BR 2 Clst | | | 0.00 | 0.00 | 0.00 |

USAA77 00065

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**Room: Bathroom 2**

| 181.33 SF Walls | 28.44 SF Ceiling | 209.77 SF Walls & Ceiling |
| 28.44 SF Floor | 3.16 SY Flooring | 22.67 LF Floor Perimeter |
| | | 22.67 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| Room Totals: Bathroom 2 | | | 0.00 | 0.00 | 0.00 |
|---|---|---|---|---|---|

**Room: Bedroom 3**

| 429.33 SF Walls | 174.56 SF Ceiling | 603.90 SF Walls & Ceiling |
| 174.56 SF Floor | 19.40 SY Flooring | 53.67 LF Floor Perimeter |
| | | 53.67 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| Room Totals: Bedroom 3 | | | 0.00 | 0.00 | 0.00 |
|---|---|---|---|---|---|

**Room: BR 3 Clst**

| 154.67 SF Walls | 14.36 SF Ceiling | 169.03 SF Walls & Ceiling |
| 14.36 SF Floor | 1.60 SY Flooring | 19.33 LF Floor Perimeter |
| | | 19.33 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| Room Totals: BR 3 Clst | | | 0.00 | 0.00 | 0.00 |
|---|---|---|---|---|---|

2006-02-06-1511                                    02/07/2006  Page: 5

**USAA77 00066**

USAA Insurance

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**Room: Kitchen**

| 444.00 SF Walls | 169.58 SF Ceiling | 613.58 SF Walls & Ceiling |
| 169.58 SF Floor | 18.84 SY Flooring | 55.50 LF Floor Perimeter |
| | | 55.50 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 169.58 SF | 0.41 | 69.53 | 0.00 | 69.53 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 169.58 SF | 5.26 | 892.01 | 223.01 | 669.00 |
| Seal then paint the ceiling (2 coats) | 169.58 SF | 0.56 | 94.97 | 47.49 | 47.48 |
| R&R Blown-in insulation - 6" depth - R19 | 169.58 SF | 0.88 | 149.23 | 74.62 | 74.61 |
| **Room Totals: Kitchen** | | | **1,285.57** | **357.57** | **928.00** |

**Room: Pantry**

| 138.67 SF Walls | 18.67 SF Ceiling | 157.33 SF Walls & Ceiling |
| 18.67 SF Floor | 2.07 SY Flooring | 17.33 LF Floor Perimeter |
| | | 17.33 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 18.67 SF | 0.41 | 7.65 | 0.00 | 7.65 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 18.67 SF | 5.26 | 98.18 | 24.54 | 73.64 |
| Seal then paint the ceiling (2 coats) | 18.67 SF | 0.56 | 10.45 | 5.23 | 5.22 |
| R&R Blown-in insulation - 6" depth - R19 | 18.67 SF | 0.88 | 16.43 | 8.22 | 8.21 |
| **Room Totals: Pantry** | | | **212.54** | **50.44** | **162.10** |

USAA77 00067

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**Room: Hallway**

| | | | |
|---|---|---|---|
| 297.33 SF Walls | 53.75 SF Ceiling | 351.08 SF Walls & Ceiling |
| 53.75 SF Floor | 5.97 SY Flooring | 37.17 LF Floor Perimeter |
| | | 37.17 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 53.75 SF | 0.41 | 22.04 | 0.00 | 22.04 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 53.75 SF | 5.26 | 282.73 | 70.68 | · 212.05 |
| Seal then paint the ceiling (2 coats) | 53.75 SF | 0.56 | 30.10 | 15.05 | 15.05 |
| R&R Blown-in insulation - 6" depth - R19 | 53.75 SF | 0.88 | 47.30 | 23.65 | 23.65 |

| Room Totals: Hallway | | | 462.00 | 121.83 | 340.17 |
|---|---|---|---|---|---|

**Room: Hall Clst**

| | | | |
|---|---|---|---|
| 118.67 SF Walls | 12.29 SF Ceiling | 130.96 SF Walls & Ceiling |
| 12.29 SF Floor | 1.37 SY Flooring | 14.83 LF Floor Perimeter |
| | | 14.83 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 12.29 SF | 0.41 | 5.04 | 0.00 | 5.04 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 12.29 SF | 5.26 | 64.66 | 16.16 | 48.50 |
| Seal then paint the ceiling (2 coats) | 12.29 SF | 0.56 | 6.88 | 3.44 | 3.44 |
| R&R Blown-in insulation - 6" depth - R19 | 12.29 SF | 0.88 | 10.82 | 5.41 | 5.41 |

USAA77 00068

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

CONTINUED - Hall Clst

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **Room Totals: Hall Clst** | | | **167.23** | **37.46** | **129.77** |

**Room: Bathroom 1**

|  |  |  |  |
|---|---|---|---|
| 289.33 SF Walls | 72.03 SF Ceiling | 361.36 SF Walls & Ceiling |
| 72.03 SF Floor | 8.00 SY Flooring | 36.17 LF Floor Perimeter |
| | | 36.17 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 72.03 SF | 0.41 | 29.53 | 0.00 | 29.53 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 72.03 SF | 5.26 | 378.87 | 94.72 | 284.15 |
| Seal then paint the ceiling (2 coats) | 72.03 SF | 0.56 | 40.34 | 20.17 | 20.17 |
| R&R Blown-in insulation - 6" depth - R19 | 72.03 SF | 0.88 | 63.38 | 31.70 | 31.68 |
| **Room Totals: Bathroom 1** | | | **591.95** | **159.04** | **432.91** |

**Room: Bedroom 4**

|  |  |  |  |
|---|---|---|---|
| 392.00 SF Walls | 149.81 SF Ceiling | 541.81 SF Walls & Ceiling |
| 149.81 SF Floor | 16.65 SY Flooring | 49.00 LF Floor Perimeter |
| | | 49.00 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |

2006-02-06-1511

02/07/2006  Page: 8

USAA77 00069

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**CONTINUED - Bedroom 4**

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Floor protection - self-adhesive plastic film | 149.81 SF | 0.41 | 61.42 | 0.00 | 61.42 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 149.81 SF | 5.26 | 788.02 | 197.01 | 591.01 |
| Seal then paint the ceiling (2 coats) | 149.81 SF | 0.56 | 83.90 | 41.95 | 41.95 |
| R&R Blown-in insulation - 6" depth - R19 | 149.81 SF | 0.88 | 131.84 | 65.93 | 65.91 |
| **Room Totals: Bedroom 4** | | | **1,145.01** | **317.34** | **827.67** |

**Room: BR 4 Clst**

|  |  |  |
|---|---|---|
| 158.67  SF Walls | 16.32  SF Ceiling | 174.99  SF Walls & Ceiling |
| 16.32  SF Floor | 1.81  SY Flooring | 19.83  LF Floor Perimeter |
|  |  | 19.83  LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Contents - move out then reset | 1.00 EA | 30.03 | 30.03 | 0.00 | 30.03 |
| Floor protection - self-adhesive plastic film | 16.32 SF | 0.41 | 6.69 | 0.00 | 6.69 |
| R&R Light fixture | 1.00 EA | 49.80 | 49.80 | 12.45 | 37.35 |
| R&R Three coat plaster over wood lath | 16.32 SF | 5.26 | 85.84 | 21.46 | 64.38 |
| Seal then paint the ceiling (2 coats) | 16.32 SF | 0.56 | 9.14 | 4.57 | 4.57 |
| R&R Blown-in insulation - 6" depth - R19 | 16.32 SF | 0.88 | 14.36 | 7.19 | 7.17 |
| **Room Totals: BR 4 Clst** | | | **195.86** | **45.67** | **150.19** |

2006-02-06-1511

02/07/2006   Page: 9

USAA77 00070

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

**Room: Utility**

| 289.33 SF Walls | 79.38 SF Ceiling | 368.71 SF Walls & Ceiling |
| 79.38 SF Floor | 8.82 SY Flooring | 36.17 LF Floor Perimeter |
| | | 36.17 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| Room Totals: Utility | | | 0.00 | 0.00 | 0.00 |

**Room: Covered Pat**

| 450.67 SF Walls | 194.00 SF Ceiling | 644.67 SF Walls & Ceiling |
| 194.00 SF Floor | 21.56 SY Flooring | 56.33 LF Floor Perimeter |
| | | 56.33 LF Ceil. Perimeter |

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

NOTE: No ceiling damage in this room attributable to the roof damage.

| Room Totals: Covered Pat | | | 0.00 | 0.00 | 0.00 |
| Area Items Total: Main Level | | | 8,917.22 | 2,437.97 | 6,479.25 |

**Room: Roof**

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Replace Replace gable rafters on south end | 2.00 EA | 150.00 | 300.00 | 45.00 | 255.00 |
| Remove 3 tab - 25 yr. - (hvy.wt) comp. shingle rfg - incl. felt | 25.60 SQ | 39.53 | 1,011.97 | 0.00 | 1,011.97 |
| Replace 3 tab - 25 yr. - (hvy.wt) comp. shingle rfg - incl. felt | 28.33 SQ | 138.17 | 3,914.36 | 978.59 | 2,935.77 |

2006-02-06-1511                                    02/07/2006  Page: 10

USAA77 00071

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

CONTINUED - Roof

| DESCRIPTION | QNTY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Remove Sheathing - spaced 1" x 6" | 2,560.00 SF | 0.44 | 1,126.40 | 0.00 | 1,126.40 |
| Replace Sheathing - plywood - 3/4" CDX | 2,688.00 SF | 1.76 | 4,730.88 | 1,182.72 | 3,548.16 |
| R&R Flashing - pipe jack | 2.00 EA | 28.29 | 56.58 | 14.15 | 42.43 |
| R&R Exhaust cap - through roof | 1.00 EA | 67.07 | 67.07 | 16.77 | 50.30 |
| Remove Tear off 3 ply built-up roofing (no haul off) | 2.16 SQ | 75.23 | 162.50 | 0.00 | 162.50 |
| Replace Built-up 3 ply roofing - in place | 2.27 SQ | 155.44 | 352.85 | 88.21 | 264.64 |
| Prime & paint exterior soffit - exposed rafters | 452.00 SF | 1.74 | 786.48 | 157.30 | 629.18 |

NOTE: It will be necessary to prime and pain the exposed soffit due to the replacement of the roof decking as well as the repair of the damaged gable rafters.

| | | | | | |
|---|---|---|---|---|---|
| Dumpster load - Approx. 40 yards, 7-8 tons of debris | 2.00 EA | 468.94 | 937.88 | 0.00 | 937.88 |

| | | | | |
|---|---|---|---|---|
| **Room Totals: Roof** | | 13,446.97 | 2,482.74 | 10,964.23 |
| **Line Item Totals: 2006-02-06-1511** | | 22,364.19 | 4,920.71 | 17,443.48 |

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 5,346.67 | SF Walls | 1,825.44 | SF Ceiling | 7,172.10 | SF Walls & Ceiling |
| 1,825.44 | SF Floor | 202.83 | SY Flooring | 668.33 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 668.33 | LF Ceil. Perimeter |
| 1,825.44 | Floor Area | 1,972.13 | Total Area | 5,346.67 | Interior Wall Area |
| 1,604.00 | Exterior Wall Area | 200.50 | Exterior Perimeter of Walls | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

USAA77 00072

**USAA Insurance**

P.O. Box 659461
San Antonio, TX 78265
1-800-531-8222

## Summary for Hurricane

| | | | | |
|---|---|---|---|---:|
| Line Item Total | | | | 22,364.19 |
| Material Sales Tax | @ | 7.000% x | 4,661.78 | 326.32 |
| | | | | |
| Subtotal | | | | 22,690.51 |
| Service Sales Tax | @ | 7.000% x | 5,399.72 | 377.98 |
| | | | | |
| Replacement Cost Value | | | | 23,068.49 |
| Less Depreciation | | | | (5,104.82) |
| | | | | |
| **Actual Cash Value** | | | | 17,963.67 |
| Less Deductible | | | | (1,640.00) |
| | | | | |
| **Net Claim** | | | | **16,323.67** |
| | | | | |
| Total Recoverable Depreciation | | | | 5,104.82 |
| Net Claim if Depreciation is Recovered | | | | 21,428.49 |

Kevin Hromas

2006-02-06-1511                                    02/07/2006   Page: 12

USAA77 00073